UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil No. 04-1064-MLB |
| ) | |
| COFFEYVILLE RESOURCES ) | |
| REFINING & MARKETING, LLC, ) | |
| and ) | |
| COFFEYVILLE RESOURCES ) | |
| TERMINAL, LLC, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**COMPLAINT**

The United States, by authority of the Attorney General and on behalf of the United States Environmental Protection Agency ("EPA"), alleges:

NATURE OF THE ACTION

1. This is a civil action against Defendant Coffeyville Resources Refining & Marketing, LLC ("CRRM"), the owner and operator of a refinery and certain related assets (hereinafter collectively "Refinery") in Coffeyville, Kansas formerly owned by Farmland Industries, Inc., and against Defendant Coffeyville Resources Terminal, LLC ("CRT"), the owner and operator of a terminal and certain related assets in Phillipsburg, Kansas (hereinafter "Terminal") formerly owned by Farmland Industries, Inc. These acquisitions by Defendants were pursuant to a sale order entered by the United States Bankruptcy Court for the Western District of Missouri on or about November 4, 2003.

2. By virtue of its acquisition of the Refinery, Defendant CRRM is in violation of the Clean Air Act ("the Act") statutory and regulatory requirements applicable to the petroleum refining industry, specifically Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, Prevention of Significant Deterioration ("PSD"), and New Source Performance Standards ("NSPS") regulations, 42 U.S.C. §§ 7470-7492 and 7411, 40 C.F.R. Part 60, Subparts A, J, and GGG; and the Kansas state

implementation plan ("SIP"). The United States brings this action pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and seeks an order requiring Defendant to comply with the Act and the laws and regulations promulgated thereunder.

3. By virtue of its acquisition of the Refinery, Defendant CRRM is subject to requirements of the Solid Waste Disposal Act ("SWDA"), as amended by the Resource Conservation and Recovery Act ("RCRA") with the Hazardous and Solid Waste Amendments, 42 U.S.C. § 6901, *et seq.*, and the regulations promulgated thereunder, based on the historic generation, treatment, storage and/or disposal of hazardous and/or solid wastes at the refinery.

4. By virtue of its acquisition of the Terminal, Defendant CRT is subject to the requirements of SWDA, as amended by RCRA with the Hazardous and Solid Waste Amendments, 42 U.S.C. § 6901 *et seq.*, and the regulations promulgated thereunder, based on the historic generation, treatment, storage and/or disposal of hazardous and/or solid wastes at the terminal.

## JURISDICTION, VENUE AND NOTICE

5. This Court has jurisdiction over the subject matter of this action and over the Parties pursuant to 28 U.S.C. §§ 1331, 1345 and 1355. In addition, this Court has jurisdiction over the subject matter of this action pursuant to Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b) and 7477, and pursuant to Section 3008(a)(1) of RCRA, 42 U.S.C. § 6928(a)(1). The United States' complaint states a claim upon which relief may be granted against Defendants. Authority to bring this suit is vested in the United States Department of Justice by 28 U.S.C. §§ 516 and 519, and Section 305 of the CAA, 42 U.S.C. § 7605.

6. Venue is proper in the District of Kansas pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Section 3008(a)(1) of RCRA, 42 U.S.C. § 6928(a)(1), and 28 U.S.C. §§ 1391(b)-(c) and 1395(a).

7. Notice of the commencement of this action has been given to the State of Kansas in accordance with Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1), and as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b) and Section 3008(a)(2), of RCRA, 42 U.S.C. § 6928(a)(2).

## THE DEFENDANTS

8. Defendant CRRM is a corporation doing business in Kansas.

9. Defendant CRT is a corporation doing business in Kansas.

10. Defendants CRRM and CRT are each a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

## STATUTORY AND REGULATORY BACKGROUND

11. Congress enacted the Clean Air Act to protect and enhance the quality of the nation's air, so as to promote the public health and welfare, and the nation's productive capacity. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

<u>Prevention of Significant Deterioration</u>

12. Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("national ambient air quality standards" or "NAAQS") for certain criteria air pollutants. The primary NAAQS must be adequate to protect the public health, and the secondary NAAQS adequate to protect the public welfare, from known or anticipated adverse effects associated with the ambient presence of criteria air pollutants.

13. Pursuant to Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. These designations have been approved by EPA and are located at 40 C.F.R. Part 81. An area that meets the NAAQS for a particular pollutant is classified as an "attainment area" for that pollutant; one that does not is classified as a "non-attainment area" for that pollutant.

14. Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in attainment areas. The PSD requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to ensure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision-making process.

15. Section 165(a) of the Act, 42 U.S.C. § 7475(a), provides that no "major emitting facility" on which "construction has commenced" after August 7, 1977, may be "constructed" in any attainment area unless, among other requirements, a PSD permit authorizing such construction and operation has been properly issued to the facility and the facility is subject the Best Available Control Technology ("BACT") for each pollutant subject to regulation under the Act.

16. Section 169(1) of the Act, 42 U.S.C. § 7479(1), defines "major emitting facility" to include petroleum refineries that emit, or have the potential to emit, 100 tons per year ("TPY") or more of any air pollutant.

17. "Construction" is defined in Section 169 of the Act, 42 U.S.C. § 7479, to include the "modification" of any source or facility, and "modification" is defined in Section 111(4) of the Act, 42 U.S.C. § 7411(4), to mean "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

18. Section 110 of the Act, 42 U.S.C. § 7410, requires each state to adopt, and submit to EPA for approval, a State Implementation Plan ("SIP") that provides for the attainment and maintenance of the NAAQS.

19. Section 161 of the Act, 42 U.S.C. § 7471, requires state implementation plans ("SIPs") to contain emission limitations and such other measures as may be necessary to prevent significant deterioration ("PSD") of air quality in attainment areas.

20. The requirements for SIPs are set forth in 40 C.F.R. Part 51. The PSD requirements for SIPs are set forth in 40 C.F.R. § 51.166.

21. The Kansas SIP was first approved on November 8, 1973, with approved revisions on December 11, 1984 and January 12, 1993, and incorporated into the federal PSD regulations at 40 C.F.R. § 52.869, *et seq*. The Kansas SIP is codified at K.A.R. 28-19-17 through 28-19-17q, and K.A.R. 28-19-300. The Kansas SIP generally adopts as its PSD regulations the relevant and applicable provisions of the federal PSD regulations, which are set forth in 40 C.F.R. § 52.21. *See* K.A.R. 28-19-17a.

Complaint

22. K.A.R. 28-17-19f, which incorporates by reference 40 C.F.R. § 52.21(i), states that no stationary source or modification to which the requirements of 40 C.F.R. § 52.21(j) through (r) apply shall begin actual construction without an approved permit.

23. K.A.R. 28-19-17p, incorporating 40 C.F.R. § 52.21(r), states that any owner or operator who constructs or operates a source or modification not in accordance with a PSD application, or with the terms of any approval to construct, or any owner or operator of a source or modification who commences construction without applying for and receiving approval under the Kansas PSD regulations, shall be subject to appropriate enforcement action.

24. K.A.R. 28-19-17b, incorporating 40 C.F.R. § 52.21(b)(1), defines the term "major stationary source" to include petroleum refineries which emit, or have the potential to emit, 100 TPY or more of any air pollutant subject to regulation under the Act.

25. K.A.R. 28-19-17b, incorporating 40 C.F.R. § 52.21(b)(8), defines "construction" as any physical change or change in the method of operation, including fabrication, erection, installation, demolition, or modification of an emissions unit, which would result in a change in actual emissions.

26. K.A.R. 28-19-17b, incorporating 40 C.F.R. § 52.21(b)(2), defines the term "major modification" to mean any physical change in, or change in the method of operation of, a major stationary source that results in a significant net emissions increase of any pollutant regulated by the Act.

27. K.A.R. 28-19-17b, incorporating 40 C.F.R. § 52.21(b)(3), defines a "net emissions increase" to include any increase in actual emissions from a particular physical change or change in the method of operation at a stationary source.

28. K.A.R. 28-19-17b, incorporating 40 C.F.R. § 52.21(b)(23), defines "significant" to include, among other things, a rate of emissions that would equal or exceed any of the following rates: 100 TPY of carbon monoxide ("CO") emissions, 40 TPY of nitrogen oxides ("NOx") emissions, 40 TPY of sulfur dioxide ("SO2") emissions, 25 TPY of particulate matter ("PM")

emissions, 15 TPY of PM10 emissions, 40 TPY of volatile organic compound ("VOC") emissions, and 10 TPY of hydrogen sulfide ("H2S") emissions.

29. K.A.R. 28-19-17j, incorporating 40 C.F.R. § 52.21(m), requires every application for a permit to contain, among other things, an analysis of ambient air quality in the area affected by the construction or major modification of the source for every pollutant the source has the potential to emit in significant or significantly increased quantities.

30. K.A.R. 28-19-17g, incorporating 40 C.F.R. § 52.21(j), requires owners or operators of major modifications located in areas designated as attainment or unclassifiable to install BACT for each pollutant for which the modification would result in a significant net emissions increase at the source.

31. Section 113 of the Act, 42 U.S.C. § 7413, and 40 C.F.R. § 52.23, authorize federal enforcement of violations of the Kansas SIP.

New Source Performance Standards (NSPS)

32. The Administrator of EPA has, pursuant to Section 111(f) of the Act, 42 U.S.C. § 7411(f), promulgated standards of performance for new sources, known as the New Source Performance Standards ("NSPS"). The NSPS regulations are set forth at 40 C.F.R. Part 60.

33. Section 111(a)(2) of the Act, 42 U.S.C. § 7411(a)(2), defines a "new source" as any stationary source constructed or modified after the publication of the regulation prescribing a standard of performance for that source.

34. Section 111(a)(4) of the Act, 42 U.S.C. § 7411(a)(4), defines "modification" to mean "any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount."

35. Section 111(a)(3) of the Act, 42 U.S.C. § 7411(a)(3), defines a "stationary source" as any building, structure, facility, or installation which emits or may emit any air pollutant.

36. Section 111(e) of the Act, 42 U.S.C. § 7411(e), provides that, after the effective date of a NSPS, it shall be unlawful for the owner or operator of any new source to operate in violation of any applicable standard or performance.

NSPS for Petroleum Refineries (40 C.F.R. Part 60, Subpart J)

37. 40 C.F.R. Part 60, Subpart J, establishes standards of performance for petroleum refineries, including requirements for implementing and utilizing good air pollution control practices at all times.

38. 40 C.F.R. § 60.100 states that the provisions of 40 C.F.R. Part 60, Subpart J are applicable to affected facilities in petroleum refineries constructed or modified after June 11, 1973.

39. 40 C.F.R. § 60.100(a) states that affected facilities include, among other things, fuel gas combustion devices as defined at 40 C.F.R. § 60.101.

40. 40 C.F.R. § 60.104(a)(1) requires that fuel gas that contains H2S in excess of 230 mg/dscm shall not be burned in any fuel gas combustion device.

41. "Fuel gas" is defined at 40 C.F.R. § 60.101 to mean any gas which is generated at a petroleum refinery and which is combusted.

42. 40 C.F.R. § 60.105(a)(3) and (4) requires that emission concentrations of H2S prior to combustion in a fuel gas combustion device, or SO2 after combustion in a fuel gas combustion device, be continuously monitored and recorded.

NSPS for Equipment Leaks of VOC (40 C.F.R. Part 60, Subpart GGG)

43. 40 C.F.R. Part 60, Subpart GGG, establishes standards for detecting and repairing volatile organic compound ("VOC") equipment leaks at petroleum refineries.

44. 40 C.F.R. § 60.590 states that the provisions of 40 C.F.R. Part 60, Subpart GGG are applicable to compressors and the group of all the equipment within a process unit in VOC service, as defined in 40 C.F.R. § 60.591, constructed or modified after January 4, 1983.

45. 40 C.F.R. § 60.592 makes the requirements of 40 C.F.R. §§ 60.482-1 to 60.482-10 and 60.486 to 60.487 applicable to each owner and operator subject to the requirements of 40 C.F.R. Part 60, Subpart GGG.

- 7 -

Complaint

46. 40 C.F.R. § 60.482-4(a) and (b) requires that, except during pressure releases, each pressure relief device in gas/vapor service shall be operated with no detectable emissions, and that after each pressure release, the pressure relief device shall be returned to a condition of no detectable emissions, as indicated by an instrument reading of less than 500 ppm above background, and monitored to confirm the conditions of no detectable emissions, as soon as practicable but no later than 5 calendar days after the pressure release.

47. 40 C.F.R. § 60.482-4(c) further provides that any pressure relief device is exempt from the requirements of 40 C.F.R. § 60.482-4(a) and (b) if it is equipped with a closed-vent system capable of capturing and transporting leakage through the pressure relief device to a control device, as described in 40 C.F.R. § 60.482-10.

48. 40 C.F.R. § 60.482-10 sets forth the standards for closed-vent systems and control devices.

## FACTUAL ALLEGATIONS

49. The Refinery is, and was at the time the modifications cited in this Complaint were made, a "major emitting facility" within the meaning of Section 169(1) of the Act, 42 U.S.C. 21 7479(1), and a "major stationary source" within the meaning of the K.A.R. 28-19-17b, and 40 C.F.R. § 52.21(b)(1), for one or more criteria pollutants.

50. At all times relevant to this Complaint, the Refinery was located in an area that had attained the NAAQS for the pollutants relevant to this action under Section 107(d) of the Act, 42 U.S.C. § 7407(d), and was therefore designated as "Class II" under Section 162(b) of the Act, 42 U.S.C. § 7472(b).

51. Starting on or about March 1, 2004, Defendant CRRM has been the "owner and operator" of the Refinery within the meaning of Section 111(a)(5) of the Act, 42 U.S.C. § 7411(a)(5). Prior to September 1, 1999, and after December 31, 2000, until on or about March 1, 2004, Farmland Industries, Inc. was the "owner and operator" of the Refinery within the meaning of Section 111 (a)(5) of the Act, 42 U.S.C. § 7411(a)(5). From September 1, 1999 through December 31, 2000, Farmland Industries, Inc. participated in a joint management venture called Cooperative Refining,

LLC, which was the "operator" of the Refinery within the meaning of Section 111(a)(5) of the Act, 42 U.S.C. § 7411(a)(5).

52. Defendant CRRM is the owner or operator of a "stationary source" which contains an "affected facility," the "construction or modification" of which was commenced after the date of publication of 40 C.F.R. Part 60, Subparts J and GGG, as those terms are defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a), and 40 C.F.R. § 60.2.

FIRST CLAIM FOR RELIEF
*PSD – Failure to Apply for a PSD Permit and Operating the Refinery without a PSD Permit in Violation of K.A.R. 28-19-17f and 28-19-17p.*

53. Beginning in 1994, Farmland Industries, Inc. began refinery expansion projects to increase the capacity of the Refinery from 71,000 to 125,000 barrels per day ("the expansion projects").

54. Farmland Industries, Inc. constructed major modifications to refinery process units during the expansion projects, including but not limited to the Fluidized Catalytic Cracking Unit (FCCU), after August 7, 1977, within the meaning of K.A.R. 28-19-17b, incorporating by reference 40 C.F.R. § 52.21(b)(2).

55. The major modifications to Refinery process units during the expansion project, including but not limited to the modification to the FCCU, resulted in a significant net emissions increase of nitrogen oxides, sulfur dioxide, volatile organic compounds, particulate matter, and PM10, within the meaning of K.A.R. 28-19-17b, incorporating by reference 40 C.F.R. § 52.21(b)(23).

56. Farmland Industries, Inc. did not apply for or receive a PSD permit prior to commencing construction on the major modifications to the Refinery as a result of the expansion projects, including but not limited to the FCCU. The Refinery still does not have such a permit for the expansion project or the major modifications to the FCCU, and no application for such a permit has been submitted.

57. Farmland Industries, Inc. constructed a major modification to a sour water stripper process stream vent when Boilers 1 through 5 were taken off-line, after August 7, 1977, within the meaning of K.A.R. 28-19-17b, incorporating by reference 40 C.F.R. § 52.21(b)(2).

58. The major modification to the sour water stripper process stream vent resulted in a significant net emissions increase of hydrogen sulfide, within the meaning of K.A.R. 28-19-17b, incorporating by reference 40 C.F.R. § 52.21(b)(23).

59. Farmland Industries, Inc. did not apply for or receive a PSD permit prior to commencing construction on the major modification to a sour water stripper process stream vent. The Refinery still does not have such a permit for the major modification to the sour water stripper process stream vent, and no application for such a permit has been submitted.

60. Farmland Industries, Inc. constructed a major modification to a crude unit process heater by replacing a crude unit process heater with a RADCO crude heater, after August 7, 1977, within the meaning of K.A.R. 28-19-17b, incorporating by reference 40 C.F.R. § 52.21(b)(2).

61. The major modification to the crude unit process heater resulted in a significant net emissions increase of nitrogen oxides, within the meaning of K.A.R. 28-19-17b, incorporating by reference 40 C.F.R. § 52.21(b)(23).

62. Farmland Industries, Inc. did not apply for or receive a PSD permit prior to commencing construction on the major modification to the crude unit process heater. The Refinery still does not have such a permit for the major modification to the crude unit process heater, and no application for such a permit has been submitted.

63. Prior to March 1, 2004, Farmland Industries, Inc. was subject to the requirements of K.A.R. 28-19-17 through 28-19-17q as owner and/or operator of the Refinery. By virtue of becoming the owner and operator of the Refinery on or about March 1, 2004, Defendant CRRM is subject to the requirements of K.A.R. 28-19-17 through 28-19-17q.

64. As the owner and the operator of the Refinery, Defendant CRRM since March 1, 2004, has been in violation of K.A.R. 28-19-17f and 28-19-17p, incorporating by reference 40 C.F.R. § 52.21(i) and (r), and Section 165(a) of the Act, 42 U.S.C. § 7475(a). CRRM is subject to

Complaint

injunctive relief to cease the violations of the Act and its implementing regulations, and the Kansas SIP.

Complaint

## SECOND CLAIM FOR RELIEF
*PSD – Failure to Install Best Available Control
Technology (BACT) in Violation of K.A.R. 28-19-17g.*

65. Farmland Industries, Inc. did not install Best Available Control Technology ("BACT") for nitrogen oxides, sulfur dioxide, volatile organic compounds, particulate matter, or PM10 on Refinery process units modified during the expansion project, including but not limited to the FCCU, in violation of K.A.R. 28-19-17g, incorporating by reference 40 C.F.R. § 52.21(j), and Section 165(a) of the Act, 42 U.S.C. § 7475(a).

66. Farmland Industries, Inc. did not install BACT for hydrogen sulfide on the sour water stripper process stream vent, in violation of K.A.R. 28-19-17g, incorporating by reference 40 C.F.R. § 52.21(j), and Section 165(a) of the Act, 42 U.S.C. § 7475(a).

67. Farmland Industries, Inc. did not install BACT for nitrogen oxides on the RADCO crude heater, in violation of K.A.R. 28-19-17g, incorporating by reference 40 C.F.R. § 52.21(j), and Section 165(a) of the Act, 42 U.S.C. § 7475(a).

68. By virtue of becoming the owner and operator of the Refinery on or about March 1, 2004, Defendant CRRM is subject to the requirement to install BACT.

69. As the owner and the operator of the Refinery, Defendant CRRM since March 1, 2004, has been in violation of the requirement to install BACT, and is subject to injunctive relief to cease the violations of the Act and its implementing regulations, and the Kansas SIP.

## THIRD CLAIM FOR RELIEF
*PSD – Emissions of Hydrogen Sulfide from the sour
water stripper process stream vent.  K.A.R. 28-19-22.*

70. Farmland Industries, Inc.'s modification to a sour water stripper process stream vent, as set forth in the First Claim for Relief above, caused the emission of a process gas stream containing hydrogen sulfide in concentrations greater than 10 grains per 100 cubic feet of gas, in violation of K.A.R. 28-19-22.

71. By virtue of becoming the owner and operator of the Refinery on or about March 1, 2004, Defendant CRRM is subject to the requirements of K.A.R. 28-19-22.

Complaint

- 12 -

72. As the owner and operator of the Refinery since March 1, 2004, Defendant CRRM is subject to injunctive relief requiring compliance with K.A.R. 28-19-22.

## FOURTH CLAIM FOR RELIEF
*NSPS – Requirements of 40 C.F.R. Part 60, Subpart J.*

73. The fuel gas combustion devices which receive fuel gas from the coker blowdown compressor system and the API separator at the refinery are subject to the requirements of 40 C.F.R. Part 60, Subpart J.

74. Farmland Industries, Inc. failed to monitor $SO_2$ emissions from fuel gas combustion devices, as required by 40 C.F.R. § 60.105(a)(3) or alternatively, to monitor the $H_2S$ concentration in fuel gases prior to being burned in fuel gas combustion devices, as required by 40 C.F.R. § 60.105(a)(4), at the coker blowdown compressor system and the API separator.

75. Since becoming the owner and operator of the refinery on or about March 1, 2004, Defendant CRRM is subject to the requirements of 40 C.F.R. Part 60, Subpart J, Standards of Performance for Petroleum Refineries, that applies to fuel gas combustion devices constructed or modified after June 11, 1973, pursuant to 40 C.F.R. § 60.100(b).

76. As the owner and operator of the Refinery since March 1, 2004, Defendant CRRM is subject to injunctive relief requiring compliance with 40 C.F.R. Part 60, Subpart J.

## FIFTH CLAIM FOR RELIEF
*NSPS – Requirements of 40 C.F.R. Part 60, Subpart GGG*

77. The pressure-relief devices at the Refinery were not and are not monitored after each pressure release to ensure no detectable emissions, as required by 40 C.F.R. § 60.482-4(a) and (b).

78. The pressure-relief devices were not and are not routed to a closed-vent system capable of capturing and transporting leakage through the pressure-relief devices to a control device which meets the standards in 40 C.F.R. § 60.482-10, as required by 40 C.F.R. § 60.482-4(c).

79. By virtue of becoming the owner and operator of the Refinery on or about March 1, 2004, Defendant CRRM is subject to the requirements of 40 C.F.R. Part 60, Subpart GGG, for pressure-relief devices constructed or modified after January 4, 1983 at the Refinery, which incorporates by reference 40 C.F.R. §§ 60.482-1 to 60.482-10.

80. Because certain pressure-relief devices at the Refinery are neither monitored in compliance with 40 C.F.R. § 60.482-4(a) and (b), nor connected to a closed-vent system that is routed to a control device meeting the requirements of 40 C.F.R. § 60.482-10 in compliance with 40 C.F.R. § 60.482-4(c), Defendant CRRM is in violation of Section 111(e) of the Act, 42 U.S.C. § 7411(e), and 40 C.F.R. § 60.482-4.

81. As the owner and operator of the Refinery since March 1, 2004, Defendant CRRM is subject to injunctive relief requiring compliance with 40 C.F.R. Part 60, Subpart GGG.

## SIXTH CLAIM FOR RELIEF
*Resource Conservation and Recovery Act ("RCRA").*

82. Owners and operators of hazardous waste disposal facilities are subject to the requirements of RCRA, including but not limited to RCRA Section 3004, 42 U.S.C. § 6924, which among other things contains requirements for maintaining financial assurance and liability insurance, monitoring groundwater, and for taking corrective action in the event of releases of hazardous waste, and RCRA Section 3005, 42 U.S.C. § 6925, which among other things sets forth permitting requirements.

83. The State of Kansas has promulgated regulations implementing 42 U.S.C. §§ 6924 and 6925 for the State of Kansas.

84. At the Refinery, there are ten inactive hazardous waste management units subject to 42 U.S.C. § 6924 and 6925, and the State's implementing regulations.

85. At the Terminal, there is one inactive hazardous waste unit subject to 42 U.S.C. § 6924 and 6925, and the State's implementing regulations.

86. Where the Administrator of EPA determines that there has been a release of hazardous waste into the environment from a facility authorized to operate under 42 U.S.C. § 6925(e), RCRA Section 3008(h), 42 U.S.C. § 6928(h) authorizes the Administrator to issue an order requiring corrective action or other measures as are necessary to protect human health and the environment.

87. Pursuant to RCRA § 3008, 42 U.S.C. § 6928, Farmland Industries, Inc. signed and EPA issued three Administrative Orders on Consent addressing releases of hazardous waste at the Refinery and the Terminal.  (EPA Order Nos. VII-94-H-0018, VII-94-H-0020, and VII-95-H-011.)

88. By virtue of becoming the owner and operator of the Refinery and the Terminal, and the associated hazardous waste management units, on or about March 1, 2004, Defendants CRRM and CRT are subject to the requirements of 42 U.S.C. §§ 6924, 6925 and 6928, and the State's implementing regulations.

89. Pursuant to RCRA Section 3008(a) and (h), 42 U.S.C. § 6928(a) and (h), Defendants CRRM and CRT are subject to injunctive relief to ensure compliance with requirements of RCRA and the administrative orders.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America requests that this Court:

1. Order Defendant CRRM to immediately comply with the Clean Air Act statutory and regulatory requirements cited in this Complaint;

2. Order Defendants CRRM and CRT to comply with the statutory and regulatory RCRA requirements, and the administrative orders, cited in this complaint; and

3. Grant the United States such other relief as this Court deems just and proper.

Respectfully submitted,

**s/Thomas L. Sansonetti**
THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

**s/Robert E. Maher, Jr.**
ROBERT E. MAHER, JR.
Assistant Section Chief
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4241

Complaint

ERIC F. MELGREN
United States Attorney
District of Kansas


**s/Emily B. Metzger**
EMILY B. METZGER, Ks.S.Ct.No. 10750
Assistant U.S. Attorney
1200 Epic Center, 301 N. Main
Wichita, KS  67202
(316) 269-6481
(316) 269-6484 (FAX)
emily.metzger@usdoj.gov

OF COUNSEL

Becky Ingrum Dolph
Deputy Regional Counsel
United States Environmental
  Protection Agency, Region VII
901 N. 5th Street
Kansas City, Kansas  66101


#651900-v1-Coffeyville_Complaint.WPD

Complaint
- 16 -

- 17 -

## REQUEST FOR PLACE OF TRIAL

      The defendant, United States of America, requests that the above-entitled cause be placed on the docket for trial at the City of Wichita, Kansas.

                                            Respectfully submitted,

                                            ERIC F. MELGREN
                                            United States Attorney

                                            **s/Emily B. Metzger**
                                            EMILY B. METZGER
                                            Assistant U.S. Attorney