**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

THE UNITED STATES OF AMERICA

    and

THE STATE OF KANSAS, ex rel.
KANSAS DEPARTMENT OF HEALTH
AND ENVIRONMENT,

        Plaintiffs,

    v.

COFFEYVILLE RESOURCES REFINING &
MARKETING, LLC,

        Defendant.

No. 6:04-cv-01064

---

**DEFENDANT COFFEYVILLE RESOURCES REFINING AND MARKETING, LLC'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

---

## I.      INTRODUCTION

The United States, on behalf of the United States Environmental Protection Agency ("EPA"), and the State of Kansas, acting by and through the Kansas Department of Health and Environment ("KDHE") (collectively, "Plaintiffs"), filed a First Supplemental Complaint in the above-captioned action (Dkt. 32) ("Complaint" or "Compl."), asserting nine counts for alleged violations of the Clean Air Act, the Kansas Air Quality Act, various federal and state regulations, and federal and state permits at Coffeyville Resources Refining & Marketing, LLC's ("CRRM") petroleum refinery in Coffeyville, Kansas. Pursuant to FED. R. CIV. P. 12(b)(6), Defendant Coffeyville Resources Refining & Marketing, LLC hereby moves to dismiss Kansas' claims for civil penalties under K.S.A. § 65-3018 in Counts One through Nine of the Complaint. CRRM also moves to dismiss Count Nine of the Complaint in its entirety.

## II.      BACKGROUND

### A. Background on CRRM

CRRM owns and operates a petroleum refinery in Coffeyville, Montgomery County, Kansas. (Declaration of John Ditmore (hereinafter, "Ditmore Decl.") ¶ 6, Ex. B, at 3)[1] The refinery is located approximately 100 miles northeast of Cushing, Oklahoma. CRRM employs around 500 people and processes approximately 132,000 barrels of crude oil per day into finished petroleum products, such as gasoline, diesel fuels, and propane. In addition to the process units that refine crude oil into finished petroleum products, the refinery operates flaring devices, which are used to dispose of gases generated from the refining process and to prevent over-pressurization and/or ensure safety of those units during start-up, shutdown, or malfunction events. *See Standards of Performance for Petroleum Refineries*, 72 Fed. Reg. 27,177, 27,187 (May 14, 2007). The flares at the CRRM refinery that are the subject of the Plaintiffs' claims in this action are the Coker Flare, and the Cold Water Pond (Cold Pond) Flare. (*See, e.g.*, 2017 Title V Permit: Att. C, at 5–6)

### B. Background on the CAA

Like many other environmental statutes, the Clean Air Act ("CAA") is jointly administered by the federal government and the states. *See Sierra Club v. U.S. EPA*, 99 F.3d 1551, 1553 (10th Cir. 1996). It establishes a comprehensive federal program for controlling and improving air quality, and it does so through "an experiment in cooperative federalism" that divides responsibilities between EPA and the states. *Envt'l Integrity Project v. U.S. EPA*, 969 F.3d 529,

---

[1] With this Motion, CRRM is submitting copies of Title V permits that KDHE issued to it in 2006 and 2017. (*See* Ditmore Decl., ¶¶ 5–6, Ex. A ("2006 Title V Permit") & Ex. B ("2017 Title V Permit")) Although Plaintiffs did not attach these permits as exhibits to the Complaint, several of Plaintiffs' claims allege that CRRM violated the terms of these permits. (*See* Compl., ¶¶ 106–07, 114–15, 122, 127, 137, 147–48, 156, 164) Therefore, the Title V permits are "central to the plaintiff's claim and referred to in the complaint," and the Court may consider them in ruling on CRRM's motion to dismiss, without converting it to a motion for judgment on the pleadings or motion for summary judgment. *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005); *see also Textron Aviation, Inc. v. Superior Air Charter, LLC*, 420 F. Supp. 3d 1186, 1192 n.4 (D. Kan. 2019).

535 (5th Cir. 2020). Under sections 111 and 112 of the CAA, EPA establishes emissions standards for certain categories of new and modified stationary sources, such as petroleum refineries, and standards for emissions of hazardous air pollutants from those source categories. *See generally* 42 U.S.C. §§ 7411, 7412.[2] States may develop and submit plans to EPA to implement the NSPS and NESHAPs that EPA establishes. *See* 42 U.S.C. § 7411(c), 7412(l). EPA will approve such plans if it determines that they are adequate to ensure compliance with the relevant federal standards. 42 U.C.S. §§ 7411(c)(1), 7412(5).

In addition, Title V of the CAA establishes an operating permit program for all "major sources" of air pollutants. *See* 42 U.S.C. §§ 7661–7661(f). EPA sets minimum requirements with which state Title V permitting programs must comply. *See generally* 42 U.S.C. § 7661a(b); 40 C.F.R. Part 70. A state can then develop and submit a permitting program to EPA to implement these requirements, which becomes effective upon EPA approval. *See* 42 U.S.C. § 7661a(d). Under the Title V operating permit program, all CAA requirements applicable to a "major source" are incorporated into an operating permit known as a Title V permit. 42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a). The Title V permit does not impose new substantive requirements on the source, but rather, consolidates into a single permit all existing CAA requirements with which the source must comply. *See Envt'l Integrity Project*, 969 F.3d at 536–37 (background on Title V permitting program).

Like many other states, EPA has delegated authority to Kanas to implement the federal NSPS and NESHAPs at issue in this litigation[3] and the Title V operating permit program. *See* 40

[2] Emission standards promulgated under 42 U.S.C. § 7411 are referred to as "new source performance standards" (or "NSPS"), whereas emission standards promulgated under 42 U.S.C. § 7412 are referred to as "national emission standards for hazardous air pollutants" (or "NESHAPs"). The petroleum refining sector is subject to multiple NSPS and NESHAPs under 40 C.F.R. Parts 60 and 63.
[3] *See* U.S. EPA, *Delegation of Authority in Kansas for New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants* (last updated Jun. 1, 2020), *available at*

C.F.R. Part 70, Appendix A, Kansas (g). The rules and regulations that Kansas has adopted to implement these CAA programs are codified under the Kansas Air Quality Act ("KAQA") and its implementing regulations. *See* K.A.R. §§ 28-19-720, 28-19-750 (incorporating by reference federal NSPS and NESHAPs into Kansas law); K.A.R. §§ 28-19-500 to 28-19-564 (Kansas Title V permitting program). The KAQA prohibits any person from violating any of these regulations or the terms conditions of any permit issued thereunder. *See* K.S.A. §§ 65-3025(b)–(c). Upon finding that such a violation has occurred, KDHE must provide notice and the opportunity for a hearing, which must be conducted in accordance with the Kansas Administrative Procedure Act, to the person alleged to commit the violation. K.S.A. § 65-3018(b). Upon finding that such a violation has occurred, KDHE may impose a penalty not to exceed $10,000, K.S.A. § 65-3018, or issue an order directing the person to "take such action as necessary to correct the violation." K.S.A. § 65-3011.

### C. CRRM's Title V Permits

KDHE has issued CRRM the following Class I operating permits pursuant to Title V of the CAA: Permit No. 265, which was issued on August 8, 2006 (the 2006 Title V Permit), and Permit No. 9458, which was issued on January 17, 2017 (the 2017 Title V Permit) to replace the 2006 Title V Permit.[4] The Coker and Cold Pond Flares are subject to certain requirements under NSPS Subparts A and J in the 2006 Title V Permit and under NSPS Subparts A and Ja in the 2017 Title V Permit.[5] (*See* 2006 Title V Permit: Att. D, at 35, 44–45, 92; 2017 Title V Permit: Att. D,

---

https://www.epa.gov/ks/delegation-authority-kansas-new-source-performance-standards-and-national-emission-standards (delegating to Kansas authority to implement and enforce NSPS Subpart Ja and NESHAP Subpart CC and Subpart UUU).

[4] *See supra*, FN.1.

[5] In both permits, the Coker Flare is designated Emissions Unit ID EU-00-004 and the Cold Pond flare is designated Emissions Unit ID EU-08-102. (2006 Title V Permit: Att. C, at 3–4; 2017 Title V Permit: Att. C, at 5)

at 51–56) Under NSPS Subparts A, J and Ja, the concentration of hydrogen sulfide ($H_2S$) in gases combusted in the flares must be less than 162 parts per million ("ppm"), unless an exemption from this standard applies. *See* 40 C.F.R. § 60.104(a)(1) (limit expressed as 0.10 gr/dscf); 40 C.F.R. § 60.102a(h).

Both permits contain various reporting requirements, several of which are relevant to this motion. With respect to reporting deviations from permit requirements that result in excess emissions, both permits provide:

> *Unless a different time period is specified in this permit* . . . [d]eviations which result in emissions exceeding those allowed in this permit shall be reported the next business day following the discovery of the release, with follow-up written notice within five business days following discovery of the release.

2006 Title V Permit, at 14; 2017 Title V Permit, at 12 (emphasis added).

In addition to this requirement, both permits require CRRM to report exceedances of the 162 ppm $H_2S$ concentration standard in the semi-annual reports submitted under NSPS Subparts A, J, and Ja. Specifically, the 2006 Title V Permit requires CRRM to "[c]omply with all general provisions of NSPS Subpart A as applicable." (2006 Title V Permit: Att. D, at 92) That regulation requires *semi-annual* reporting of excess emissions from the Coker and Cold Pond Flares. *See* 40 C.F.R. §§ 60.1, 60.7(c) (requiring submission of excess emission reports on a semiannual basis). Likewise, Conditions 350 and 352 of the 2017 Title V Permit require submission of semi-annual excess emission reports for the Coker and Cold Pond Flares, in accordance with 40 C.F.R. § 60.7(c). (*See* 2017 Title V Permit: Att. D, at 54–55)

### III.        STANDARD OF REVIEW

A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) should be granted if the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). To survive such a motion,

a complaint must present factual allegations that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This plausibility requirement serves to "weed out claims that do not . . . have a reasonable prospect of success." *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1248 (10th Cir. 2008). In ruling on a motion to dismiss, the court will assume as true all-pleaded facts in the complaint and view them in a light most favorable to plaintiff. *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984). But, "where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.     ARGUMENT

### A.  This Court should dismiss Kansas' claim for penalties under K.S.A. § 65-3018.

In Counts One through Nine of the Complaint, Kansas alleges that CRRM violated the 2006 Title V Permit, the 2017 Title V Permit, and/or various NSPS and NESHAPs, and is seeking civil penalties under K.S.A. § 65-3018 for those alleged violations. (*See* Compl, ¶¶ 56, 106, 111, 114, 119, 122, 124, 127, 129, 134, 137, 139, 141, 147–48, 150, 156–57, 160, 164, 166) However, Kansas must bring these claims for relief through the state administrative process and cannot assert them here. Therefore, the Court should dismiss Kansas' state law claims for civil penalties in Counts One through Nine.

As mentioned above, EPA delegated authority to Kansas to implement the CAA's Title V permitting program and the NSPS and NESHAPs at issue in this litigation, which have been incorporated into the KAQA. (*See supra*, Section II(B)) This delegation reflects EPA's determination that Kansas law contains adequate measures for the state to implement and enforce the state-issued Title V permits and federally promulgated NSPS and NESHAPs. *See* 42 U.S.C. §§ 7411(c)(1), 7412(l), 7661a(b)(5). Indeed, as EPA has acknowledged on several occasions,

K.S.A. §§ 65-3011 and 65-3018, the provision of *state* law under which Kansas is seeking relief against CRRM in *this* Court, gives KDHE authority to impose penalties and order corrective action against any person who violates any permit KDHE issues, or any rule or regulation it promulgates, under the KAQA. *See* K.S.A. § 65-3025; *Approval and Promulgation of Implementation Plans; State of Kansas; Infrastructure SIP Requirements for the 2008 Lead National Ambient Air Quality Standard*, 79 Fed. Reg. 41,476, 41,481 (Jul. 16, 2014) (approving revision to Kansas SIP And noting that K.S.A. §§ 65-3011, 3018 provide appropriate authority for enforcement thereof); *Clean Air Act Proposed full Approval of Operating Permits Program; State of Kansas, and Delegation of 112(l) Authority*, 60 Fed. Reg. 34,493, 34,494 (Jul. 3, 1995) (noting that Kansas Title V operating permit program meets federal requirements for enforcement authority).

Kansas is seeking to exercise that enforcement authority here, but under the plain terms of the enabling statutes, it must do so through the state's administrative process—not in federal court. As noted, Kansas is seeking penalties under K.S.A. § 65-3018 for alleged violations of CRRM's Title V permits and various NSPS and NESHAPs, which are independently enforceable under the KAQA. *See* K.S.A. § 65-3025 (making it unlawful for any person to violate any rule promulgated under the KAQA or any provision of a permit issued under the KAQA); K.S.A. §§ 65-3011, 3018 (authorizing penalties and injunctive relief for violations of K.S.A. § 3025). However, to obtain the requested relief, KDHE must provide notice and opportunity for a hearing regarding the alleged violations, which must be conducted in accordance with the Kansas Administrative Procedure Act. *See* K.S.A. §§ 65-3011(b), 65-3018(b). Upon finding that such a violation has occurred, KDHE may impose a penalty not to exceed $10,000, K.S.A. § 65-3018, or issue an order directing the person to "take such action as necessary to correct the violation." K.S.A. § 65-3011.

In short, state law clearly contemplates that KDHE's claims for penalties and injunctive relief under the KAQA must proceed through state administrative process—not in federal court. Indeed, nothing in the CAA authorizes KDHE to seek penalties or injunctive relief *under state law* for the violations alleged here. Section 113 of the Clean Air Act—the purported basis for the Court's jurisdiction over the Complaint—authorizes *the EPA* to bring a civil action against a person for certain violations of the CAA, upon notice to the person and the appropriate state. *See, e.g.*, 42 U.S.C. §§ 7413(a)(1), (3). But as the Tenth Circuit recognized, this language reflects

> the procedural perquisites before the *Administrator* [of the EPA] may file suit. There is no language in the Act that authorizes a state to bring a federal enforcement action. Rather, § 7413 is essentially a default provision providing that the [EPA] will enforce the SIP when a state fails to do so.

*Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 493 (10th Cir. 1994) (emphasis in original). In *Espinosa*, the New Mexico Environmental Department sued for various violations of New Mexico's federally approved state implementation plan ("SIP"), after successfully prosecuting claims for the same violations in state court. *Id*. at 492. The Tenth Circuit affirmed the district court's dismissal of the case, noting that, although the state retains authority to enforce regulations adopted and approved pursuant to the CAA, it is "limited to state enforcement of the federally-approved SIP through the state administrative and judicial process." *Id*.

Although *Espinosa* concerned state enforcement of an EPA-approved SIP, its holding applies equally to this case.[6] Like the federally approved New Mexico SIP in *Espinosa*, EPA has

---

[6] The SIP is another example of the federal-state partnership that is built into the CAA. EPA sets national ambient air quality standards ("NAAQS") for certain air pollutants and allows each state to establish a state implementation plan ("SIP") to implement, maintain, and enforce those standards. *See* 42 U.S.C. §§ 7409, 7410. The EPA may then approve or disapprove the state's proposed SIP or force revisions to it. 42 U.S.C. § 7410(c). Similar to the approach that EPA takes when delegating authority to implement the NSPS/NESHAPs or Title V permitting program, EPA will only approve a SIP if it contains adequate enforcement mechanisms. *See* 42 U.S.C. § 7410(a)(2).

delegated authority to Kansas to implement and enforce the CAA's Title V operating permit program and the NSPS and NESHAPs at issue in this litigation. (*See supra*, Section II(B)) Kansas is seeking penalties and injunctive relief *under state law* for CRRM's alleged violations of those delegated programs. *See* K.S.A. §§ 65-3011, 3018, 3025. Under the reasoning in *Espinosa* (and, as discussed above, the plain language of the state enabling statutes), Kansas must seek this relief through state administrative process—not in federal court.

Of course, Plaintiffs allege that Kansas is vested with authority to bring its claims in federal court pursuant to the citizen suit provision of the CAA. (Compl, ¶ 14 (citing 42 U.S.C. § 7604)) However, this does not save Kansas' claim for penalties under K.S.A. § 65-3018. First, Kansas has not alleged that it provided the requisite 60-day notice of its intent to sue CRRM, which is a mandatory condition precedent to any citizen suit. *See* 42 U.S.C. § 7604(b)(1); *Anderson v. Farmland Indus., Inc.*, 45 F. Supp. 2d 863, 865 n.3 (D. Kan. 1999). Second, EPA is (obviously) already diligently prosecuting claims for the same violations pursuant to section 113 of the CAA. *See* 42 U.S.C. § 7604(b)(2). This means that, while Kansas may intervene as-of-right, it cannot bring state law penalty claims for the exact same violations for which EPA is seeking penalties under the CAA. *See id.* § 7604(b)(1)(B); *cf. Maryland Waste Coalition v. SCM Corp.*, 616 F. Supp. 1474, 1483–84 (D. Md. 1985) (barring environmental group's citizen suit where plaintiff sought to enforce compliance with the same standards at the same emission sources that were subject of EPA's prior claims). Finally, and as discussed above, K.S.A. § 65-3018 clearly contemplates that penalty determinations thereunder will be made through the *state* administrative process. Nothing in the citizen suit provision of the CAA authorizes the imposition of penalties under *Kansas law* against CRRM.[7]

---

[7] In *Anderson*, this Court noted that a citizen suit cannot be commenced under the CAA if the plaintiff fails to provide the required 60-day notice, or if the EPA or the state "'has commenced

**B. The Court should dismiss Count Nine in the Complaint.**

Plaintiffs allege that, on certain days between November 11, 2015 and the present, gases combusted in the Coker and Cold Pond Flares exceeded the 162 ppm $H_2S$ concentration standard applicable to those flares and were not otherwise exempt from the standard. (Compl., ¶¶ 106, 108, 114, 116) They further allege that, by failing to report these exceedances to KDHE by phone within one business day and in writing within five business days, CRRM violated the 2006 Title V Permit and 2017 Title V Permit.[8] (Compl., ¶ 164)

In fact, neither permit required CRRM to report excess $H_2S$ exceedances from the flares by phone the next business day or in writing within five business days. Plaintiffs' allegations ignore key language in CRRM's Title V permits, which provide that deviations resulting in excess emissions must be reported within one and five business days "*unless* a different time period is specified in the permit." (2006 Title V Permit, at 14; 2017 Title V Permit, at 12) Both permits *do*

---

and is diligently prosecuting'" a civil action to require compliance with the relevant standard, limitation, or order. 45 F. Supp. 2d at 865 (quoting 42 U.S.C. § 7604(b)(1)(B)). In making this statement, the Court relied in part on *Hallstrom v. Tillamook Cty.*, 493 U.S. 20 (1989), where the Supreme Court affirmed the Ninth Circuit's decision that a plaintiff's failure to comply with an analogous 60-day notice requirement under the Resource Conservation and Recovery Act ("RCRA") deprived the district court of subject matter jurisdiction over the plaintiff's suit. *See Anderson*, 45 F. Supp. 2d at 865 n.3. The Supreme Court did not directly address whether the notice provision was "jurisdictional in the strict sense of the term," but did conclude that the "notice and 60-day delay requirements are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision." *Hallstrom*, 493 U.S. at 31. Thus, dismissal of Kansas' claim for civil penalties under K.S.A. 65-3018 would also be warranted pursuant to Fed. R. 12(b)(1) (lack of subject matter jurisdiction), to the extent the Court believes that Kansas' failure to comply with the "mandatory conditions precedent" for citizen suits under 42 U.S.C. § 7604(b) deprives the Court of jurisdiction to hear those claims.

[8] Plaintiffs also allege that these reporting deficiencies are violations of K.A.R. § 28-19-512(a)(11)(B), (Compl., ¶ 163), but this is incorrect. Section 28-19-512 of the Kansas Administrative Rules prescribes what terms and conditions *must be included* in a Title V operating permit and requires that the source operate in compliance with those terms. *Id.* § 28-19-512(a). It does not impose independent, substantive reporting obligations on CRRM. The regulation requires that Title V permits include "applicable reporting requirements," including "prompt" reporting of deviations from permit conditions "*as specified in the permit.*" K.A.R. § 28-19-512(a)(11)(B) (emphasis added). As noted above, the relevant permits state that certain reporting must occur within one and five business days, *unless* a different time period is specified. Thus, even if the regulation *did* impose a substantive reporting requirement (it does not), it requires no more than what is stated in the Title V permits.

specify a different time period for reporting $H_2S$ exceedances from the Coker and Cold Pond Flares. Specifically, the permits require *semi-annual* reporting of exceedances of the 162 ppm standard from the flares. Therefore, the Court should dismiss Count Nine because it fails to state a claim upon which relief can be granted.

Under the 2006 Title V Permit, the Coker and Cold Pond Flares were subject to the 162 ppm $H_2S$ concentration standard under NSPS Subpart J. (*See* 2006 Title V Permit: Att. D., at 35, 44 (referencing 40 C.F.R. § 60.104(a)(1)) By virtue of being subject to this emission standard under NSPS Subpart J, the Coker and Cold Pond Flares were also required to comply with the applicable reporting requirements of NSPS Subpart A. *See* 40 C.F.R. § 60.1 (NSPS Subpart A applies to affected facilities that are constructed or modified after the date of publication of any NSPS applicable to that facility). In fact, the 2006 Title V Permit plainly requires CRRM to comply with NSPS Subpart A. (2006 Title V Permit, at 92) Under that regulation, reporting of excess emissions from the flares—such as those described in Paragraphs 107, 115, and 164 of the Complaint—must occur on a *semi-annual* basis. *See* 40 C.F.R. § 60.7(c) ("Each owner or operator required to install a continuous monitoring device shall submit excess emissions and monitoring systems performance report (excess emissions are defined in applicable subparts) . . . to the Administrator *semiannually*," except in certain circumstances not relevant here) (emphasis added).

The same reporting rules applied to the 2017 Title V Permit. Under that permit, both the Coker and Cold Pond Flares are subject to the 162 ppmv $H_2S$ standard under NSPS Subpart Ja. (*See* 2017 Title V Permit: Att. D, at 54 (referencing 40 C.F.R. § 60.103a(h)) Conditions 350 and 352 of the 2017 Title V Permit require *semi-annual reporting* of excess emissions from the flares under NSPS Subpart Ja. (*See* 2017 Title V Permit: Att. D, at 54–55 (referencing semi-annual reporting requirement under 40 C.F.R. § 60.7(c))

By incorporating by reference the *semi-annual* reporting requirements of 40 C.F.R. § 60.7(c), both permits specify a "different time period" for reporting excess emissions—meaning CRRM was simply not required to report excess emissions within one or five business days, as Plaintiffs allege. In other words, even assuming Plaintiffs' well-pled allegations are true—namely, that CRRM did not report excess emissions from the Coker and Cold Pond Flares by phone within one business day of discovery or in writing within five business days of discovery—Plaintiffs have no claim for relief. This is because, as discussed above, the permits simply did not require reporting of excess emissions within this time period. Rather, both permits required CRRM to submit excess emission reports for the Coker and Cold Pond Flares on a *semi-annual* basis.

In sum, Count Nine alleges that CRRM failed to report excess emissions from the Coker and Cold Pond Flares within one or five business days, in violation of its Title V permits. (*See* Compl., ¶¶ 162–166) But since CRRM's Title V permits only required reporting of excess emissions from the flares on a *semi-annual* basis, this Count fails to state a claim upon which relief can be granted. To state a plausible violation of CRRM's Title V permits, Plaintiffs would have to allege that CRRM failed to report such exceedances on a semi-annual basis. Plaintiffs make no such allegation here, so Count Nine must be dismissed. *See Whitney v. State of New Mexico*, 113 F.3d 1170, 1175 (10th Cir. 1997) (failure to allege all the elements necessary to state a claim for relief warrants dismissal).

## V.        CONCLUSION

For the foregoing reasons, CRRM respectfully requests that this Court dismiss Kansas' claim for penalties under K.S.A. § 65-3018 in Counts One through Nine of the Complaint and dismiss the Ninth Claim for Relief in the Complaint.

Respectfully submitted,

DATED: March 8, 2021                     /s/    *Eliot L. Kaplan*              
                                               Eliot L. Kaplan
KSD Bar No. 17068
**Perkins Coie LLP**
2901 North Central Ave., Suite 2000
Phoenix, AZ  85012-2788
Telephone:  602.351.8385
Facsimile:  602.648.7028
Email: ekaplan@perkinscoie.com

LeAnn Johnson Koch (admitted *Pro Hac Vice*)
**Perkins Coie LLP**
700 Thirteenth Street NW, Suite 800
Washington, DC 20005-3960
Telephone:  202.654.6209
Facsimile: 202.654.9943
Email: leannjohnson@perkinscoie.com

*Attorneys for Defendant Coffeyville Resources
Refining & Marketing LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of March, 2021, I electronically filed the foregoing declaration in the above-captioned proceeding with the clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to: Elizabeth Loeb, Emily B. Metzger, Helen Y. Li, Joanna Citron Day, and Kate Janelle Gleeson.

Dated:  March 8, 2021

/s/     *Eliot L. Kaplan*
Eliot L. Kaplan
KSD Bar No. 17068
**Perkins Coie LLP**
2901 North Central Ave., Suite 2000
Phoenix, AZ  85012-2788
Telephone:  602.351.8385
Facsimile:  602.648.7028
Email: ekaplan@perkinscoie.com