**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| AND ) | |
| ) | |
| THE STATE OF KANSAS, ex rel. ) | |
| KANSAS DEPARTMENT OF ) | Civ. No.  6:04-cv-01064 |
| HEALTH AND ENVIRONMENT, ) | |
| ) | PLAINTIFFS' RESPONSE TO |
| Plaintiffs ) | PETITION FOR JUDICIAL REVIEW |
| ) | |
| v. ) | |
| ) | |
| COFFEYVILLE RESOURCES ) | |
| REFINING & MARKETING, LLC ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**INTRODUCTION**

The United States, on behalf of the Environmental Protection Agency (EPA), and the

Kansas Department of Health and the Environment (KDHE) (collectively Plaintiffs), file this

Response to the Petition for Judicial Review (Petition) (ECF No. 40) filed by Coffeyville

Resources Refining & Marketing, LLC (CRRM).  CRRM's Petition seeks Court review of the

United States' and Kansas' decision to assess stipulated penalties under a 2012 Consent Decree,

which is embodied in Plaintiffs' February 3, 2021 Statement of Position (SOP).[1]

---

[1] Plaintiffs have attached to this Response their stipulated penalty demands (Demands) (*see* Exhibits 1 and 2), served on CRRM pursuant to Paragraph 202 of the Consent Decree and Plaintiffs' Statement of Position (*see* Exhibit 3) on the dispute that, pursuant to Paragraph 221 of the Consent Decree, marks the end of the dispute resolution process. The SOP is the written summary of the Plaintiffs' position regarding the dispute and reflects Plaintiffs' decision to assess stipulated penalties on which CRRM is seeking Court review in its Petition.  CRRM superficially levies various arguments in its Petition that are elucidated more fully in the SOP.  CRRM has objected to Plaintiffs' filing certain documents attached to the SOP (although not specifically the SOP or Plaintiffs' Demands) that it designated as confidential settlement communications pursuant to Federal Rule of Evidence 408 (FRE 408).  These documents include the Notices of Dispute that CRRM submitted to Plaintiffs pursuant to Paragraph 219 of the Consent Decree

Page 1.

This case has a seventeen-year history that has now culminated with two recent proceedings before this Court, both of which concern CRRM's violations of requirements related to emissions and monitoring of air pollutants from its petroleum refinery (Refinery) located in Coffeyville, Kansas.  First, the Petition seeks Court review of EPA's decision to levy stipulated penalties for CRRM's violations of a 2012 Consent Decree (ECF No. 14) that settled CAA claims (CD).  Second, on December 28, 2020, Plaintiffs filed a Supplemental Complaint alleging CAA violations that occurred after entry of the 2012 CD.  ECF No. 32.  This Response concerns the first of these two matters.

The violations underlying both actions exhibit CRRM's *modus operandi*: to delay undertaking necessary compliance actions for as long as possible.  The stipulated penalty demands and Supplemental Complaint both allege violations caused by CRRM's delay in implementing required CAA measures.  And, even though the Parties have been discussing these violations for nearly a year, and the CD gave CRRM sixty days to file its petition, the Petition seeks to further delay resolution of the violations caused by CRRM's prior procrastinations.

CRRM contends that there are two categories of issues underlying the dispute over stipulated penalties.  First, it points to "threshold legal issues" which it acknowledges are ripe for review but does not propose to brief them for another three months.  Petition at 2.  Second, CRRM refers to, but does not identify, other issues that involve "disputes over the merits of the Plaintiffs' underlying claims for stipulated penalties."  *Id*.  CRRM argues that to promote judicial economy the Court should delay briefing on the unidentified merit issues until it first rules on the

---

that respond to Plaintiffs' Demands, and which CRRM's Petition references but does not attach.  Plaintiffs disagree with CRRM's overbroad and improper use of the FRE 408 designation.  However, for the purposes of this Response and to streamline the adjudication of the threshold legal issues, Plaintiffs have not attached any document that CRRM designated as a settlement communication but reserve the right to do so when briefing the substantive claims laid forth in the SOP.

"threshold legal issues." Petition at 2. CRRM neither identifies the disputed merits issues nor proposes a deadline for briefing them. It also asks that CRRM — and only CRRM — be given three months of unlimited discovery without providing any rationale for why discovery is necessary. *Id.*

CRRM's arguments for delaying briefing of both sets of issues, and its request for discovery, lack merit. The so-called threshold legal issues were discussed by the Parties in the dispute resolution process preceding the filing of CRRM's Petition. CRRM detailed its position on these issues in its notices of dispute under Paragraph 219 of the CD, which responded to Plaintiffs' Demands, and Plaintiffs responded in detail to the arguments CRRM raised in their notices in the SOP pursuant to Paragraph 221 of the CD. Yet, while acknowledging that these issues are ripe and ready for adjudication, CRRM requests ninety days to brief them (in addition to the sixty days it already had after Plaintiffs served the SOP). *See* Petition at 6. CRRM could have substantively briefed these issues in its Petition while also requesting discovery on the issues underlying the merits. CRRM's failure to do so reveals that its true goal is delay and not judicial economy. Moreover, as detailed below, CRRM's position on these issues are largely foreclosed by CD provisions that it agreed to and now wants the Court to re-write.

CRRM also asks the Court to allow it, but not Plaintiffs, to take discovery on two disputed claims. As set forth below, the SOP embodies the agencies' decision to assess stipulated penalties and judicial review should be confined to the record of that decision. Discovery is contrary to this limited scope of review. CRRM has not given a single reason as to why it needs to supplement the record of the dispute through discovery or *any* basis to suggest that that Plaintiffs have relevant information about *CRRM's* violations at *its* Refinery.

Page 3.

There is no reason to delay the Court's determination of either "threshold legal issues" or the merits underlying Plaintiffs' stipulated penalty demand. Plaintiffs have unsuccessfully spent seventeen years attempting to ensure that CRRM complies with CAA requirements, and it has been nearly a year since Plaintiffs sent CRRM a demand for stipulated penalties. As a result, it is now time for Court assistance in these efforts.

**RELEVANT FACTUAL AND LEGAL BACKGROUND**

I.    HISTORY OF THE REFINERY AND CONSENT DECREES

The Refinery processes crude oil into refined petroleum products, including propane, gasoline, distillates, and petroleum coke, and has a production capacity of 132,000 barrels per day. *See https://www.coffeyvillecrude.com/#/corp-info/refining.* Among numerous process units at the Refinery are the following three flares: the coker flare (Coker Flare), cold water pond flare (CWP Flare), and an alky flare. CD ¶ 60. Flares are open air combustion devices that destroy refinery waste gas, resulting in emissions of various air pollutants including sulfur dioxide ($SO_2$).

CRRM purchased the Refinery from the Farmland Industries' bankruptcy estate in 2004. 2004 CD at 2, ECF No. 8. Immediately prior to the purchase, Plaintiffs and CRRM entered into a consent decree (2004 CD) that resolved some, but not all, CAA violations at the Refinery. ECF No. 8. The 2004 CD was replaced with the 2012 CD which required additional injunctive measures, including requirements related to Refinery flares, and resolved additional CAA violations. ECF No. 14. The 2012 CD remains in effect.

II.   CD PROVISIONS RELEVANT TO THIS DISPUTE

The CD unequivocally states that "[i]t is the purpose of the Parties to this Consent Decree to further the objectives of the Clean Air Act." CD ¶ 13. To effectuate this purpose, the CD requires CRRM to comply with certain emission limits, work practices, monitoring, reporting,

recordkeeping, and other requirements.  *See, e.g.*, CD ¶¶ 15–162, 170–76.  Like most consent decrees, in this CD, the Parties agreed to stipulated penalties for CD violations as well as to procedures for resolving disputes over stipulated penalties.  *See* CD ¶¶ 201–03, 219–21.

The focus of this dispute concerns the CD requirement that CRRM comply with the New Source Performance Standards (NSPS), regulations promulgated by EPA pursuant to Section 111 of the CAA.  *See* 42 U.S.C. § 7411.  Two related NSPS subparts apply to certain sources of air pollution at petroleum refineries: Subpart J (40 C.F.R. § 60.100 *et seq*.) and Subpart Ja (40 C.F.R. § 60.100a *et seq*.).  Both Subparts J and Ja impose requirements for refinery flares in order to protect public health and the environment.  Prominent among them is a limit on the hydrogen sulfide ($H_2S$) concentration in the gas that is flared.  *See* 40 C.F.R. §§ 60.104(a), 60.103a(h).  When combusted, $H_2S$ forms $SO_2$, which, pursuant to Section 108 of the CAA, EPA has determined "may reasonably be anticipated to endanger public health or welfare."  *See* 42 U.S.C. § 7408(a)(1)(A).  In particular, airborne $SO_2$ exposure compromises respiratory health, harms vegetation, and decreases plant growth.  *See* https://www.epa.gov/so2-pollution/sulfur-dioxide-basics#effects.  Both Subparts J and Ja aim to reduce $SO_2$ emissions from flares by limiting $H_2S$ concentration in the gas being flared.  77 Fed. Reg. 56422, 30, 42 (Sept. 12, 2012). Accordingly, Subparts J and Ja require refineries to monitor $H_2S$ concentration in the gas being flared.  *See* 40 C.F.R. §§ 60.105, 60.107a.  Subpart Ja also requires monitoring of other parameters including gas flow to each flare, performance tests and evaluations of monitoring equipment, adherence to monitoring equipment quality assurance and calibrations requirements, and submission of flare management plans to EPA.  *See* 40 C.F.R. § 60.100a *et seq.*

Paragraph 60 of the CD requires that CRRM comply with Subpart J at all three Refinery flares.  *See* CD ¶ 60.  In addition, Paragraph 61 of the CD requires compliance with Subpart Ja in

lieu of Subpart J if, prior to CD termination, a flare became subject to Subpart Ja.  CD ¶ 61. There is no dispute that by November 11, 2015, Subpart Ja had become applicable to the CWP and Coker Flares and that CRRM was required to comply with Subpart Ja in lieu of Subpart J thereafter.  *See* CRRM Notices of Applicability, attached hereto as Exhibit 4.

III.    CD VIOLATIONS AND DISPUTE RESOLUTION RECORD

The focus of this dispute concerns CRRM's violations of Subparts J and Ja, and thus CD Paragraphs 60 and 61, at the CWP and Coker Flares.  On June 19, 2020, pursuant to Paragraph 202 of the CD, Plaintiffs demanded stipulated penalties from CRRM for twenty-four different types of CD violations, eighteen of which were violations of Subparts J and Ja requirements.  *See* Plaintiffs' Demand at 2–6, attached hereto as Exhibit 1; *see also* Petition, Attachment A.  On August 18, 2020, CRRM filed a notice of dispute and responded to Plaintiffs' Demand pursuant to CD Paragraphs 203 and 219.  *See* Petition at 3–4.  CRRM disputed most of the CD violations underlying Plaintiffs' Demand and paid the stipulated penalties for those violations it did not dispute (it also paid the disputed penalty amounts into escrow, as the CD required).  *Id.*  Pursuant to CD Paragraph 219, the Parties conferred about the dispute and on October 1, 2020, Plaintiffs sent CRRM a supplemental demand for stipulated penalties that clarified certain issues and further detailed the stipulated penalties demanded.  *See* Plaintiffs' Supplemental Demand, attached hereto as Exhibit 2.  CRRM responded to the Supplemental Demand on November 30 and once again the Parties satisfied Paragraph 219's requirement that they informally confer. *See* Petition at 3–4.

On January 8, 2021, after unsuccessful attempts to resolve the disputes informally, Plaintiffs sent CRRM a written notice ceasing informal dispute resolution in accordance with CD Paragraph 220.  *See* Petition at 4.  Pursuant to Paragraph 221 of the CD, Plaintiffs thereafter

served the Statement of Position on CRRM setting forth Plaintiffs' decision that CRRM is liable for $6,819,600 in stipulated penalties (which reflected a reduction in stipulated penalties from the demands).  *See Id.* at 1; *see also* SOP.  CRRM subsequently ceased disputing one claim and paid $2,600 in stipulated penalties for that claim, bringing the amount currently due to $6,817,000.  The Consent Decree provides that the Plaintiffs' SOP is binding unless Defendant files a Petition for review within sixty days.

On April 5, 2021, CRRM filed its Petition requesting Court review of eighteen claims for stipulated penalties, all of which are based on CRRM's violations of CD Paragraphs 60 and 61 which require CRRM to comply with Subpart J or Subpart Ja.  *See* Petition, Attachment A. Specifically, Plaintiffs assessed stipulated penalties for CRRM's failure to comply with Subpart J's monitoring requirements before Subpart Ja applied to the Refinery flares (Violations 1–2). The rest of the violations (Violations 3–18) are for CRRM's violations of nine different Subpart Ja requirements related to monitoring, performance tests and evaluations of monitoring equipment, monitoring equipment quality assurance and calibration, and submission of flare management plans to EPA.

## ARGUMENT

CRRM's Petition requests that the Court bifurcate adjudication of this dispute into two segments: (1) "threshold legal issues" and (2) the merits underlying CRRM's violations of the CD that gave rise to stipulated penalties.  Petition at 4, 5.  CRRM's Petition seeks a three-month delay in briefing the threshold issues, and does not propose any deadline by which CRRM must brief the merits.  *See* Petition at 6.  CRRM also requests that *only* it be permitted to take discovery on Plaintiffs' first two stipulated penalty claims (violation of Subpart J flare

Page 7.

monitoring requirements).  *Id.* at 5.  For the reasons set forth below, the Court can end CRRM's

pattern of postponement by rejecting CRRM's request for discovery and briefing extensions.

I.      THERE IS NO REASON TO DEFER BRIEFING ON OR DECISION OF
        THRESHOLD LEGAL ISSUES.

   A.      **CRRM's Invocation of "Threshold Legal Issues" Is Merely an Attempt to Delay Resolution of Stipulated Penalties.**

CRRM's Petition invokes generic references to "threshold legal issues" that it argues

should be resolved first because resolution could obviate the need for the Court to reach the

merits underlying CRRM's CD violations.  CRRM's so-called threshold issues are nothing more

than a poorly disguised attempt to give itself an unwarranted extension of time to address both

threshold issues and the merits of Plaintiffs' stipulated penalty demand.  The "threshold" issues

are not new but are detailed in the existing record of the dispute.  CRRM acknowledges that

these issues are ready for adjudication and that it had sixty days to brief them; CRRM should

have done so, while also asking for discovery and a delay of briefing on the merits.  Instead of

doing so, it seeks to defer such briefing for another three months.  Finally, as set forth below, the

fragility of CRRM's arguments on the threshold issues themselves also demonstrate that delay is

the true motive behind CRRM's "threshold legal issue" mantra.

   B.      **The Court Can and Should Decide Threshold Issues Now.**

As CRRM acknowledges, the threshold issues are ripe for adjudication now and therefore

Plaintiffs address them below.  There is no reason why CRRM cannot respond to these

arguments in its Reply brief submitted within fourteen days of this Response as provided by D.

Kan. Rule 6.1(d) and then these issues will be fully briefed and ready for Court determination as CRRM requests.[2]

As a preliminary matter, CRRM's positions on the threshold issues are contrary to explicit CD provisions to which it agreed.  Courts construe a consent decree as a contract and enforce the decree as a judicial order.  *See, e.g., Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 193–94 (10th Cir. 1993).  As with any contract, "the terms of the decree and the respective obligations of the parties must be found within the four corners of the consent decree."  *Id.* at 194 (citing *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971)).  In particular, courts honor consent decrees' stipulated penalty provisions, especially where, as here, they are agreed upon by sophisticated parties with equal bargaining power that are well represented by counsel.  *See, e.g. American Multi-Cinema, Inc. v. Southroads L.L.C.*, 119 F. Supp. 2d 1190, 1207 (D. Kan. 2000) (agreed upon stipulated damage provision in lease between plaintiff and defendant should be upheld because "… the parties were on equal footing-all experienced, sophisticated business people and all were represented by counsel through the lease negotiations") (citing *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir. 1985)); *Apple Corps Ltd. v. Int'l Collectors Soc.*, 15 F. Supp. 2d 456, 469 (D.N.J. 1998) ("Plaintiffs bargained for language which specifically avoids the necessity of an inquiry into the degree of neglect or willfulness involved, and affords them clear remedies based solely on breach (intentional or negligent) of 'any provision' of specified paragraphs of the Consent Order.  The Court must 'strictly construe' the Consent Order to preserve those 'bargained for positions.'").  CRRM is a sophisticated party that was represented in both the 2004 and 2012 CD negotiations by the very same counsel who filed

---

[2] CRRM should not be permitted to raise arguments in reply to this brief that it did not raise in the CD dispute resolution process.  If it does so, Plaintiffs reserve the right to seek court approval to file a sur-reply addressing such arguments.

its Petition and has extensive experience in negotiating environmental consent decrees.  The

Court should not permit CRRM to renege on agreements it made that the Court included in a

judicial order.

1.     <u>The CD Explicitly allows Plaintiffs to Seek Both Stipulated and Statutory<br>Penalties for Violations of Subpart Ja.</u>

The first threshold issue CRRM raises is its contention that Plaintiffs cannot seek both

stipulated and statutory penalties for CRRM's violations of Subpart Ja.  *See* Petition at 2.  On

December 28, 2020, Plaintiffs filed the Supplemental Complaint alleging that CRRM violated

multiple CAA requirements.  ECF No. 32.  The first two claims in the Complaint assert that

CRRM violated Subpart Ja on hundreds of days after November 11, 2015 by flaring gas that

exceeded the applicable $H_2S$ concentration limit.  *See* Supplemental Complaint ¶¶ 105, 113.

Plaintiffs' stipulated penalty claims assert *different* Subpart Ja violations, specifically violations

of monitoring, testing, evaluation, quality assurance, calibration, and flare management plan

requirements.  *See* Petition, Attachment A.  It does not seek any penalties for exceedance of

Subpart Ja's $H_2S$ concentration limit.  *Id.*

CRRM's argument that the CD bars Plaintiffs from seeking both stipulated penalties and

statutory penalties for the Subpart Ja violations is borderline frivolous.  First, the CD explicitly

and unequivocally allows Plaintiffs to seek both.  CD Paragraph 205 expressly states:

> Subject to the provisions of Section XIV of this Consent Decree (Effect of
> Settlement Reservation of Rights), **the stipulated penalties provided for in this
> Consent Decree shall be in addition to any other rights, remedies, or
> sanctions available to the United States or State for CRRM's violation of this
> Consent Decree or applicable law.**  Where a violation of this Consent Decree is
> also a violation of the Clean Air Act, CRRM shall be allowed a credit, for any
> stipulated penalties paid, against any statutory penalties imposed for such
> violation.  The United States and State will not demand stipulated penalties for a
> Consent Decree violation if they have commenced litigation seeking penalties
> under the Clean Air Act for such violation.

(emphasis added).  Thus, the CD contemplated a situation where Plaintiffs might seek both stipulated and statutory penalties for the same violations, and provided a remedy in such instance in the form of credit for stipulated penalties paid against statutory penalties awarded.  Additionally, the CD states that Plaintiffs will not demand stipulated penalties if they have already commenced litigation seeking CAA penalties for the same violation.  Plaintiffs issued the Demand on June 19, 2020, long before they filed the Supplemental Complaint.  The Court can thus dispense with this issue based on Paragraph 205 alone.  *See Berry v. Farmland Ind., Inc.*, 114 F. Supp. 2d 1150, 1157 (D. Kan. 2000) ("if the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction.") (quoting *In re Cherokee Cty., Kan, Health Care Facility Revenue Bonds*, 262 Kan. 941, 953, 946 P.2d 83. 91 (1997)).

In any event, contrary to CRRM's contention, the Supplemental Complaint and Plaintiffs' Demands do not seek penalties for the "same" violations.  *See* Petition at 2, 3.  The Supplemental Complaint seeks penalties for CRRM's violation of Subpart Ja by flaring of excess $H_2S$ in its flare gas.  *See* ECF No. 32 ¶¶ 104–19.  In contrast, Plaintiffs' stipulated penalty demand is based on CRRM's violation of different Subpart Ja requirements related to monitoring $H_2S$, flow, and Total Reduced Sulfur, testing monitoring equipment, adhering to required quality assurance and calibration requirements in its monitoring equipment, and submitting required flare management plans.  *See* Petition, Attachment A.  The CD explicitly permits these parallel actions.  CRRM should not be allowed to rewrite CD provisions, to which it agreed, to limit

Plaintiffs' ability to redress significant environmental harm and recoup the substantial economic benefit that resulted from CRRM's CAA violations.[3]

        2.      <u>Plaintiffs' Stipulated Penalty Demands Did Not Deprive CRRM of Dispute Resolution Rights.</u>

The second "threshold legal issue" concerns Plaintiffs' discretionary interpretation — in CRRM's favor — of CD Paragraph 189 which provides for stipulated penalties as follows:

> <u>Section V.J.:  NSPS for Flaring Devices</u>.  For failure to comply with applicable NSPS Subparts A and J (or Ja if CRRM becomes subject to Ja during the term of this Consent Decree) requirements for flaring devices, including emission limits, **per Flaring Device:**

| Period of Non-Compliance | Penalty per Day |
| --- | --- |
| 1st through 30th day | $500 |
| 31st through 60th day | $1,500 |
| Beyond the 60th day | $2,000 or an amount equal to 1.2 times the economic benefit of non-compliance. |

(emphasis added).  Prior to stating the penalty amounts per day, CD Paragraph 189 states that penalties are "per Flaring Device."  Plaintiffs exercised their discretion and applied this phrase conservatively and in CRRM's favor to limit stipulated penalties due for Subpart Ja violations to one stipulated penalty per flare per day, despite CRRM often violating multiple Subpart Ja requirements at the same flare on the same day.  Plaintiffs refer to this concept as "subsumation" because one flaring violation on a particular day (the primary violation) will subsume stipulated penalties for different flaring violations that occurred at the same flare on the same day.

For those Subpart Ja violations that occurred on the same days as other (primary) Subpart Ja violations, Plaintiffs assumed full subsumation would occur — that is, if the primary violation

---

[3] Plaintiffs could have sought statutory penalties for the Subpart Ja violations in its stipulated penalty demand.  To CRRM's benefit, Plaintiffs reserved the use of statutory penalties for only the $H_2S$ concentration violations, given the immense environmental harm the violations caused and the likely economic benefit CRRM gained by delaying necessary compliance expenditures.  This is exactly why the CD preserves Plaintiffs' enforcement flexibility by allowing Plaintiffs to seek statutory penalties for CD violations.  *See* SOP at 12–13.

were proved, there would be no penalties for other flaring violations at the same flare on the same day.  Plaintiffs' Demand indicated that the stipulated penalty due was for the primary violation and noted that penalties for other violations at the same flare on the same day are "subsumed," meaning that additional penalties would not accrue for other violations if the primary violation was established.  The Demand thus stated the amount due for fully subsumed violations as "$0."  *See, e.g.,* Demand at 4.  Next to the "$0" for each subsumed violation was a notation explaining that the $0 is due to subsumation.  *Id.*  For example, Plaintiffs' explanation of Violations 5 and 6 states:

> [O]ne stipulated penalty per day per flare applies even if multiple violations occurred on the same day.  As a result, some of the stipulated penalties for Violations 5-6 are subsumed by other concurrent Subpart Ja violations, as detailed in the previously emailed Excel spreadsheet.

*Id*.  This language is repeated in the description of the other Subpart Ja violations where any subsumation occurred.  The Demand also explicitly reserved Plaintiffs' right to seek stipulated penalties for subsumed violations if a primary violation was not established.  *Id.* at 2 (stating "[p]laintiffs reserve the right to seek stipulated penalties for those previously subsumed violations if any such violations are later withdrawn, or somehow found not to be violations.").  Plaintiffs included with their Demand a spreadsheet identifying all violations by type and date, including those that were subsumed.  *See* Demand at 2, n.2; SOP at 6-7.

CRRM ignored the contextual notations and the reservation Plaintiffs used to connote currently subsumed claims.  Instead, CRRM contended that the "$0" notation reflected the demand amount and that it could resolve the violation by paying "$0."  *See* SOP at 8–9.  Plaintiffs disagreed that CRRM's ploy of paying "zero dollars" resolves any stipulated penalty liability but in an abundance of caution, Plaintiffs issued to CRRM the October 1, 2020

Supplemental Demand clarifying that they were not demanding zero dollars.  The Supplemental Demand stated:

> Plaintiffs are demanding [subsumed] . . . penalties but suspended CRRM's obligation to pay such penalties at this time (and the escrowing of such funds if the claims are disputed) until Plaintiffs determine the amount of offset due to subsumation.  At any time hereafter, if Plaintiffs determine that some or all of such subsumed penalties are not subsumed, Plaintiffs will notify CRRM that it must either pay or escrow the amount due for such penalties within sixty days.[4]

Plaintiffs' Supplemental Demand at 2.  The Supplemental Demand included a table for each violation with a notation next to the penalty amounts indicating that some or all of the penalty that would otherwise be due had been subsumed by concurrent violations.  *Id*. at 4–6.  Like the initial Demand, the Supplemental Demand reserved Plaintiffs' rights to seek stipulated penalties for subsumed violations if the primary violations failed.  *Id.*

Plaintiffs had three options to effectuate subsumation consistent with Paragraph 189: (1) to assess stipulated penalties for all violations but only require payment of one stipulated penalty per flare per day and reserve the right to seek subsumed penalties later if it is determined that the primary violation is not established; (2) to demand and seek payment into escrow of all penalties, primary and subsumed, and then refund from escrow those subsumed penalties once the extent of primary penalties are determined; or (3) to demand stipulated penalties one claim at a time per flare, in this case potentially resulting in eight separate demands, statements of positions, and court actions to review each claim.  Plaintiffs' choice of the first option above is reasonable and financially beneficial to CRRM, and promotes judicial economy as opposed to

---

[4] Plaintiffs have the discretion to stay payment/escrow of stipulated penalties.  The CD in fact gives Plaintiffs the discretion to waive stipulated penalties altogether.  CD ¶ 202.  Plaintiffs control whether to demand payment for a violation and thus when to demand payment.  Plaintiffs could have assessed stipulated penalties for just the primary violations, and if the primary violations failed, could have subsequently assessed stipulated penalties for the subsumed violations.  Plaintiffs' approach streamlines this process by including all possible violations and deferring demand and payment of subsumed violations.

Page 14.

the second or third options.  It is also consistent with CD language that does not require Plaintiffs to state the exact amount of stipulated penalties but rather the amount demanded "as can be best estimated."  CD ¶ 202.  Plaintiffs did exactly that.

CRRM challenges Plaintiffs' approach stating that: "Plaintiffs' demand made the resolution of certain claims contingent on the resolution of others, which violated the Second CD's dispute resolution provisions by depriving CRRM of its ability to resolve stipulated penalty demands on a claim-by-claim basis."  Petition at 2.  It is difficult to discern whether CRRM is arguing that subsumation as required by Paragraph 189 itself somehow violates its dispute resolution rights, or whether Plaintiffs' initial Demand, which CRRM interpreted as assessing $0, did so.  In either event, CRRM's contention is without merit.

First, there is nothing in the CD or its dispute resolution section, and CRRM cites nothing that gives CRRM a right to dispute stipulated demands on "a claim by claim basis."  The CD's dispute resolution provisions are purely procedural.  *See* CD ¶¶ 216–24.  Moreover, the stipulated penalty language trumps any amorphous rights that CRRM reads between the lines of purely procedural provisions.

To the extent that CRRM is claiming that the notation of $0 in Plaintiffs' Demand forced it to choose between resolving a claim by paying zero dollars or disputing it, this conundrum is nonexistent in both theory and practice.  Plaintiffs gave CRRM a list of all violations and their dates, whether or not subsumed, and CRRM could and did simultaneously dispute the merits of some violations underlying subsumed stipulated penalties while claiming that it paid $0 and thereby resolved those same violations.  Even if CRRM is correct that Plaintiffs' Demand put it in the position of having to either pay or dispute the claim, Plaintiffs' Supplemental Demand for all penalties negated this predicament.

3.    <u>Plaintiffs Correctly Calculated Stipulated Penalties for Subpart Ja Violations.</u>

The CD provides that most stipulated penalties are assessed per violation per day of non-compliance. *See*, *e.g.,* CD ¶¶ 180–205. It specifies a maximum amount of stipulated penalties that Plaintiffs can assess for each type of CD violation based on the number of days on which that violation occurred. *Id.* Under this framework, for each violation, there are multiple penalty tiers with different amounts of stipulated penalties, usually based on the number of days of non-compliance. The graduated stipulated penalty provision at issue in this case is Paragraph 189, which has the following tiers for stipulated penalties:

| Period of Non-Compliance | Penalty per Day |
| --- | --- |
| 1st through 30th day | $500 |
| 31st through 60th day | $1,500 |
| Beyond the 60th day | $2,000 or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

Plaintiffs calculated stipulated penalties violations of Subpart Ja requirements per flare based on the total number of days of non-compliance with all Subpart Ja requirements. *See* Demand. For example, if a violation of one Subpart Ja requirement lasted 40 days and ceased, but CRRM continued to violate another Subpart Ja requirement from Days 41–45, Plaintiffs continued to assess stipulated penalties at the $1,500 per day amount for Day 41 rather than reverting to the lowest tier amount of $500 per day. Additionally, where the days of violation were not continuous, Plaintiffs did not reset the amount to the first $500 per day tier for each break in continuous days of violation. Rather, using the above example, if there was a period of compliance following Day 45, the next day of violation was counted as Day 46 in the period of non-compliance, not a new Day 1.

CRRM asserts that penalties should revert to the lowest tier ($500) with each new type of Subpart J or Ja violation. *See* Petition at 2. However, all the Subpart Ja violations are violations

of the same CD Paragraph (Paragraph 61) and thus it is appropriate to escalate stipulated penalties based on the total days of non-compliance with any Subpart Ja requirement.  Moreover, Paragraph 189 imposes stipulated penalties for failure to comply with Subpart Ja "requirements" (plural) indicating that the failure to comply with all the requirements every day is the violation.  CRRM also argues that whenever a violation ceases for a period of time, the penalties should revert to the lowest tier when the violation resumes thereafter.  However, Paragraph 189's table heading reads "period of non-compliance."[5]  CRRM's argument essentially inserts the non-existent words "continuous" or "consecutive" between the "of" and "non-compliance."[6]

### 4.    Plaintiffs' Assessment of Stipulated Penalties Until Compliance is Achieved is Appropriate.

CRRM argues that "the Plaintiffs improperly treat several alleged 'one-time' violations as 'continuing' in nature."  Petition at 3.  In the dispute resolution record, CRRM raised this argument with respect to flow monitor requirements (Violations 3–4) and certain tests that it was required to perform and performed late (Violations 5–6, 13–14, 15–16).  *See* SOP at 17.

CRRM's theory is foreclosed by CD language.  CD Paragraph 202 explicitly states that: "[s]tipulated penalties under this Section shall begin to accrue on the day after performance is

---

[5] The use of the word "through" in the rows listing the number of days, e.g. 31st through 60th day, does not denote continuity, but rather makes it clear that the day ranges are inclusive of the last day.  For example, Tier 1 is listed as "1st through 30th day" to be inclusive of day 30, and Tier 2 is listed as "31st through 60th day" to be inclusive of day 60.

[6] CRRM's position would also undermine the purpose of the CD in facilitating compliance with the CAA. For example, under CRRM's theory, 80 violations that occurred every other day (e.g. kept re-occurring) would command a stipulated penalty in the lowest tier while a single violation continuously lasting 80 days would command stipulated penalties under each tier resulting in a significantly higher stipulated penalty.  A violation that keeps re-occurring is more egregious than one that which was definitively corrected and never resumed.  Therefore, it furthers the purpose of the Consent Decree to ensure compliance with the CAA to increase the penalty amount with additional days of violation, even when they are not consecutive.  Otherwise, a defendant could reset the penalty to the lower amount by ceasing operation for one day.  *See United States v. Rueth Dev. Co.,* 335 F.3d 598, 606 (7th Cir. 2003) (looking to purpose of consent decree in interpreting ambiguous stipulated penalty provision and finding that unless penalties accrue per violation there would be no incentive to comply).

due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue **until**

**performance is satisfactorily completed or until the violation ceases**" (emphasis added).

CRRM agreed to this CD language stating that penalties accrue until compliance is achieved. As

discussed above, courts honor stipulated penalty provisions that are agreed upon by the Parties.

This is also reflected in Paragraph 189 which states that stipulated penalties for Subpart Ja

violation occur "per day" which makes no sense if a violation can only last one day.

Moreover, for similar testing requirements, the CD in this case has graduated penalties

for 1–30, 31–60 Days, etc. *See, e.g.,* CD ¶¶ 184.b (PM Stack test), 195.b and c (RATAs and

other tests). It also contains graduated penalties for reporting violations even where the report is

due on a specified day. *See*, *e.g.,* CD ¶¶ 190.b, 192.b, 192.c, 194, 196, 198.a (J/Ja reporting).

These CD provisions would be superfluous if this type of violation could only last one day.

Under CRRM's interpretation, a defendant could choose to skip the test altogether and pay a

single day of stipulated penalty, thus never testing, because a $500 stipulated penalty is far

cheaper than performing a required test that costs thousands of dollars and that could reveal

inaccurate emission monitoring and CAA violations. This does not provide an appropriate

incentive to complete testing requirements on time and would defeat the purpose of the stipulated

penalty provisions and the stated objective of the CD to deter non-compliance with the CD

provisions and CAA requirements. *See Rueth,* 335 F.3d at 606

Even if we put aside this agreed upon express CD language, courts have found continuing

violations where the requirement is an ongoing obligation and the incentive of a multi-day

penalty promotes compliance. *See, e.g., Sierra Club, Haw. Chapter v. City & Cty. of Honolulu*,

486 F. Supp. 2d 1185, 1192 (D. Haw. 2007) (language of permit, rather than statute, imposed

obligation to construct and operate disinfection facility by clear and certain deadline, and

assessing violation for each day facility not in operation to provide incentive to construct facility); *In re Umetco Minerals Corp.,* No. CAA-(113)-VIII-92-03, 1996 WL 691531, at *3 (EPA Mar. 29, 1996) (although regulation did not explicitly define requirement to perform and report radon flux measurements in terms of more than one day, obligation continued until next annual report due because purpose of requirement to demonstrate compliance with emission standard).

Finally, the regulations at issue, and their purposes, confirm that the violations continue until the requirement is met. The requirement to conduct performance tests on the continuous emissions monitoring systems (CEMS) (Violations 3–4) seeks to assure that the CEMS are working properly. Subpart Ja provides that the obligation to test continues unless and until the Administrator approves an extension. *See* 40 C.F.R. § 60.8(a)(4). Furthermore, EPA administrative courts have found a continuing violation for failure to conduct similar types of tests required by applicable regulations to demonstrate compliance with emissions limits by a deadline unless an extension is granted. *See Umetco*, 1996 WL 691531, at *5 (failure to perform and report radon flux measurements is continuing violation because purpose of requirement is to demonstrate compliance with emission standard, which is ongoing obligation); *In re Liston Brick of Corona,* CAA-9-2005-0018, 2007 WL 4618372, at *31 (EPA Dec. 18, 2007) (upholding multi-day penalty for failure to conduct performance test pursuant to NESHAP for secondary aluminum production operation, noting that regulations at issue, like those here, imposed strict liability to comply with requirement by deadline unless and until EPA grants waiver request). Similarly, the obligations to conduct $H_2S$ and Total Reduced Sulfur (TRS) CEMS performance evaluations (Violations 11–16) are ongoing requirements. In particular, the $H_2S$ CEMS is used to demonstrate compliance with the $H_2S$ concentration limit. *See* 40 C.F.R. § 60.107a(a)(2)(v).

Page 19.

To effectuate this provision, the CEMS performance testing and evaluation requirements must be considered a continuing obligation. The TRS CEMS is used to determine whether certain $SO_2$ thresholds are exceeded, triggering an obligation to conduct root cause analyses and undertake corrective action. *See* 40 C.F.R. § 60.107a(e). Thus, the continuing nature of these requirements are necessary to effectuate the regulatory purpose in demonstrating compliance with emissions standards. *See Umetco*, 1996 WL 691531, at \*5.

II.     THE COURT SHOULD REJECT CRRM'S ONE-SIDED DISCOVERY REQUEST.

CRRM seeks 120 days for discovery on Plaintiffs' assessment of stipulated penalties for CRRM's violations of Paragraph 60 of the CD by failing to comply with Subpart J's $H_2S$ monitoring requirements at the Coker and CWP Flares. Petition at 6. Asking for discovery is an emblematic CRRM delay tactic that ignores the fact that all relevant information about the violations is in the control of CRRM. The CD dispute resolution provisions do not provide for or in any way contemplate discovery and on this basis alone the Court should reject CRRM's request. In any event, CRRM has not established why discovery, which would generate material not in the dispute resolution record, should be allowed or could yield any relevant evidence.

     **A.      Discovery Contravenes the Scope of Review for An Agency Decision.**

        1.      Plaintiffs' SOP Is Equivalent to a Final Agency Action and Should be Subject to Review Based on the Dispute Resolution Record.

The decision to assess stipulated penalties was made jointly by EPA and KDHE and is embodied in the agencies' Statement of Position.[7] The Consent Decree's dispute resolution

---

[7] The Consent Decree gives EPA the ultimate authority to make decisions regarding disputes. *See* CD ¶ 221 ("In the event that the United States and KDHE make differing determinations or take differing actions that affect a Defendant's rights or obligations under this Consent Decree, the final decision of the United States will take precedence.").

procedures provide for the generation of a record consisting of specified documents exchanged by the Parties, namely Plaintiffs' Demands, CRRM's Notices of Dispute which respond to those Demands, and the Plaintiffs' SOP.  *See* CD ¶¶ 216–24.  The CD does not set forth any scope or standard of court review of the SOP.  However, it does provide that the decision in the SOP is a binding and final decision subject to Court review: "The position advanced by the United States and State shall be considered binding unless, within sixty days of a Defendant's receipt of the written summary of the United States' position, that Defendant files with the Court a petition which describes the nature of the dispute."  CD ¶ 221.

Where a statute does not state the scope or standard of court review, the default is to apply the scope and standard provided by the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*  In *Alaska Dep't of Envtl. Conservation v. EPA,* the Supreme Court characterized the APA standard of review as the "default standard" and applied it to EPA's actions under the CAA although the CAA did not specify a particular standard of review.

> Because the [CAA] itself does not specify a standard for judicial review in this instance, we apply the familiar default standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and ask whether the Agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Even when an agency explains its decision with "less than ideal clarity," a reviewing court will not upset the decision on that account "if the agency's path may reasonably be discerned."

540 U.S. 461, 496–97 (2004) (quoting *Bowman Transp., Inc. v. Ark.—Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974)).

In this case, the Court should similarly apply the APA scope and standard of review to the SOP, which is equivalent to an agency decision subject to APA.  Under the APA, and by analogy in this context, the SOP constitutes a final agency decision.  Specifically, it (1) details the factual and legal support for the decision to assess stipulated penalties, (2) was issued after a

compulsory dispute resolution process, which gave CRRM an opportunity to voice its objection, and (3) determines rights and obligations and triggers legal consequences. *See* CD ¶ 221 (CD is "binding" unless petition for review filed). *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189 (10th Cir. 2014) (quoting *Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. at 483) (final agency actions "mark the consummation of the agency's decision making process, and must either determine rights or obligations or occasion legal consequences.").

Thus, the Court should apply the same scope and standard of review to the SOP as it would if the CD specifically prescribed APA review. Accordingly, the Court's review of the SOP should be limited to the record of the dispute. *See Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001) (citing *Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 331 (1976)) ("Judicial review of an agency decision is generally limited to review of the administrative record."); *Airport Neighbors Alliance, Inc. v. United States,* 90 F.3d 426, 433 n.7 (10th Cir.1996) (same). When reviewing an agency decision, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 739 (10th Cir. 1993); *see also Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560 (10th Cir.1994). Parties may not use "post-decision information as a new rationalization either for sustaining or attacking the Agency's decision." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811–12 (9th Cir. 1980). Finally, the Court should not overturn the decision embodied by the SOP unless, based on the administrative record, it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Alaska Dep't of Envtl. Conservation,* 540 U.S. at 496–97; *Cf.* 5 U.S.C. § 706(2)(A).

2.    <u>CRRM Does Not Set Forth any Basis for an Exemption to Record Review.</u>

When review is limited to the record of an agency decision, a court considers evidence outside of that record only in "extremely limited circumstances." *Audubon Soc'y of Greater Denver v. U.S. Army Corps of Eng'rs,* 908 F.3d 593, 609 (10th Cir. 2018); *Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy,* 485 F.3d 1091, 1096 (10th Cir. 2007); *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004). The 10th Circuit has recognized five targeted circumstances that may warrant a court's review of extra-record materials:

> (1) that the agency action is not adequately explained and cannot be reviewed properly without considering the cited materials, . . .; (2) that the record is deficient because the agency ignored relevant factors it should have considered in making its decision, . . .; (3) that the agency considered factors that were left out of the formal record, . . .; (4) that the case is so complex and the record so unclear that the reviewing court needs more evidence to enable it to understand the issues, . . .; and (5) that evidence coming into existence after the agency acted demonstrates that the actions were right or wrong, . . . .

*Am. Mining Cong. v. Thomas,* 772 F.2d 617, 626 (10th Cir. 1985). In addition to the exceptions noted above, a court may consider extra-record material only if a party can submit evidence establishing bad faith or improper behavior by the agency. *Citizens for Alts.,* 485 F.3d at 1096.

Moreover, before determining if an exemption applies, the Court must first review the Parties' arguments, based on the record. *See, e.g. Chang v. U.S. Citizenship & Immigr. Servs.,* 254 F. Supp. 3d 160, 163 (D.D.C. 2017). With respect to discovery in particular, the Supreme Court has held that a district court should first determine whether or not an administrative record is complete *before* potentially allowing extra-record discovery based on an exception. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2574 (2019) ("… the District Court should not have ordered extra-record discovery when it did [when the district court concluded that the administrative record was incomplete]. At that time, the most that was warranted was the order to complete the administrative record."). Typically, "[a]n agency may not unilaterally determine what

constitutes the Administrative Record." *Bar MK Ranches*, 994 F.2d at 739–40.  In this case as well, the CD dispute resolution provisions specify that the parties create and the exchange of certain documents, a record of the dispute, and CRRM had an opportunity to submit whatever information it wanted to be in the record to EPA in response to the stipulated penalty demands. The Court should first review these documents that comprise the record underlying the agencies' decision to assess stipulated penalties before considering whether any extra-record material is warranted.

Moreover, the petitioner bears the burden of establishing that one or more of the categories of exemptions described above exists.  *See Bar MK Ranches*, 994 F.2d at 740; *Am. Mining Cong.*, 772 F.2d at 626; *Citizens for Alts.*, 485 F.3d at 1096.  CRRM has not even suggested that the record of the dispute is incomplete or that one or more of the other exceptions to record review apply in this case.  District courts will reject motions for discovery that fail to identify and explain why one or more of the narrow exceptions potentially apply.  *See, e.g. San Luis & Delta Mendota Water Auth. v. U.S. Dep't of the Interior*, 984 F. Supp. 2d 1048, 1060 (E.D. Cal. 2013); *Harvard Pilgrim Health Care of New England v. Thompson*, 318 F. Supp. 2d 1, 8–9 (D.R.I. 2004) ("…broad-ranging discovery aimed at matters not included in the administrative record is inappropriate.") (internal citations omitted); *P.R. Pub. Hous. Admin. v. U.S. Dept. of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 327 (D.P.R. 1999) (noting that a court reviewing an administrative record should not blindly authorize wide-ranging discovery).

The Court should thus review the arguments of the Parties made in the dispute resolution record.  After such review is complete, CRRM, or Plaintiffs, can request, and explain the need for, supplementation of the record with material generated through discovery or other means and the Court can then determine if consideration of extra-record material is appropriate.

B.    **There is No Relevant Information To Be Discovered From Plaintiffs.**

1.    Summary of CRRM's Subpart J Violations.

Plaintiffs assessed stipulated penalties for CRRM's violations of CD Paragraph 60 and Subpart J based on CRRM's failure to install and operate $H_2S$ monitors at the CWP and Coker Flares. *See* Petition, Attachment A (Violations 1 and 2). To assure compliance with the $SO_2$ and $H_2S$ limits, Subpart J required CRRM to install and operate an instrument to monitor either $SO_2$ emissions into the atmosphere or the concentration of $H_2S$ in fuel gases before being burned in any fuel gas combustion device, which include flares. 40 C.F.R. § 60.105(a). Flares which have a common source of fuel gas may be monitored at only one location, "if monitoring at this location accurately represents the concentration of $H_2S$ in the fuel gas being burned." *Id.* at § 60.105(a)(4)(ii). Subpart J exempts some gas streams from this monitoring requirement. *Id.* at § 60.105(a)(4)(iv).

Plaintiffs' Demand contends that for nearly three and a half years, from the date the Court entered the CD (on April 19, 2012) until Subpart Ja applied to the Refinery flares (November 11, 2015), CRRM violated the Subpart J monitoring requirements at the CWP and Coker Flares. *See* Demand at 2–3. Specifically, the $H_2S$ monitor for those flares was not installed at a location that "accurately represents the concentration of $H_2S$ in the fuel gas being burned" as required by 40 C.F.R. § 60.105(a)(4)(ii) and Paragraph 60 of the CD. Rather, the Refinery's $H_2S$ monitor for its flares was located before process units that generated $H_2S$-laden gases that were routed into the flare header system and combusted in the flares. *See id;* SOP at 18–20.

2.    CRRM Does Not Have a Reasonable Basis to Take Discovery From Plaintiffs.

All relevant information regarding the Subpart J monitoring violations is in the possession, custody, and control of CRRM. It is CRRM's Refinery, CRRM's flares, and

Page 25.

CRRM's monitor, and it is CRRM that knows which gas streams were and were not analyzed by the H2S monitor, and whether non-monitored streams were exempt.  This is the only information relevant to whether CRRM violated Subpart J and it is information that CRRM controls.  Indeed, CRRM neglects to give a single example of information that Plaintiff might have that is relevant to the Subpart J violations.

The Court should not permit CRRM to bombard the governments with discovery unless it can establish some reasonable basis to believe such discovery would yield relevant evidence.  As one Tenth Circuit district court applying the *Iqbal* pleading standard to affirmative defenses explained:

> [a]n even-handed standard as related to pleadings ensures that the affirmative defenses supply enough information to explain the parameters of and basis for an affirmative defense such that the adverse party can reasonably tailor discovery. Furthermore, "the desire to avoid unnecessary discovery (and the time and expense associated therewith) required to ascertain that boilerplate affirmative defense assertions are just that, i.e., lack any factual basis and are not viable; and the liberal standard for amendment of an answer to assert additional affirmative defenses when the factual bases for them becomes known."

*Burget v. Capital West Sec., Inc.,* 2009 WL 4807619 (W.D. Okla. Dec. 8, 2009); *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (there must be "sufficient factual matter, [which if] accepted as true ... state[s] a claim to relief that is plausible on its face.") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[8]  As the Supreme Court has noted in the context of affirmative claims that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n. 17 (1983); *see also Car Carriers, Inc. v. Ford*

---

[8] In a more standard litigation posture the governments could move to strike the defenses under Federal Rule of Civil Procedure 12(f) or serve interrogatories requiring CRRM to delineate the factual basis of each defense.

*Motor Co.*, 745 F.2d 1101, 1106 (7ᵗʰ Cir. 1984) (discovery costs and increasing federal court caseloads "counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."). Before allowing CRRM to take an unguided fishing expedition into governmental waters, the Court should first require it to articulate some basis for believing there are actually fish to catch that are big enough to sate its appetite, *i.e.* support defenses.

In this case, there are no such fish. CRRM's Petition implies that Plaintiffs knew where the monitor was located and delayed bringing this violation. *See* Petition at 3. Plaintiffs do not deny that they knew where the monitor was located; but Plaintiffs did not know what gas streams circumvented that monitor until 2016 when, in response to EPA's information requests, CRRM provided Plaintiffs with information that showed the flares were combusting sulfur-laden gases that continuously entered the flare header after the location of the monitor. *See* SOP at 21–22.

However, it is irrelevant what Plaintiffs knew about CRRM's monitor locations and when Plaintiffs knew this information.[9] Plaintiffs' knowledge and alleged acquiescence simply cannot waive their rights to enforce, or estop them from enforcing, Paragraph 60 of the CD, and the Subpart J monitoring requirements it adopts. The law is crystal clear that laches is inapplicable against the government's enforcement of a public right or interest. *Costello v. United States*, 365 U.S. 265, 281 (1961) (laches does not apply against the government for reasons that can "'be found in the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers.'") (quoting *United States v. Hoar, C.C.,* 26 F. Cas. 329, 330 (D. Mass 1821)); *United States v. Telluride Co.*, 146 F.3d 1241, 1246 n.7 (10th

---

[9] At most, Plaintiffs' acted cautiously until they were sure there was a significant violation to allege. Surely, CRRM is not suggesting that the government jarnt should assess stipulated penalties for every consent decree violation with some basis before it confirms the violation and knows its reasons, duration, extent, and harm.

Cir. 1998). Similarly, courts apply waiver and estoppel against the government only in extraordinary circumstances and under heightened standards that require an explicit waiver by an official in authority or affirmative misconduct and reliance.[10] CRRM has not alleged that any government official explicitly waived the Subpart J claims nor has it pointed to any government misconduct on which it relied. If this happened, CRRM would likely know so, or at least be able to allege a fact suggesting that such may have occurred.

### 3. If the Court Permits Discovery, It Should be Limited and Reciprocal.

If the Court allows discovery, Plaintiffs should also be permitted to take discovery. In particular, to the extent that CRRM claims there was affirmative governmental misconduct, Plaintiffs should be able to take discovery on the issue of whether CRRM relied on such alleged misconduct. Moreover, CRRM has the burden to establish that exemptions to Subpart J monitoring apply. *See, e.g., Anderson v. Farmland Indus., Inc.,* 70 F. Supp. 2d 1218, 1226 (D. Kan. 1999) (applying "general rule that the party claiming the benefits of an exception to the prohibition of a statute has the burden of proving it meets the exception" in CAA refinery case where defendant claimed malfunction exemption to emissions exceedances). To the extent that CRRM asserts that some or even all of the gas streams not monitored were exempt from the $H_2S$ limit and thus monitoring, Plaintiffs should be entitled to discovery on that issue. So, in contrast to CRRM's baseless request for discovery, if CRRM alleges that the non-monitored streams were exempt, there is information that Plaintiffs could discover that is directly relevant to their

---

[10] *See Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984); *United States v. Cherokee Nation of Okla.*, 480 U.S. 700, 707 (1987);*United States v. Allen*, 983 F.3d 463, 470 (10th Cir. 2020)); *Bass v. Potter*, 522 F.3d 1098, 1106 (10th Cir. 2008); *United States v. La.-Pac. Corp.*, 682 F. Supp. 1122, 1139 (D. Colo. 1987); *United States ex. rel. Monahan v. Robert Wood Johnson Univ. Hosp. at Hamilton*, No. 02-5702, 2009 WL 4576097, *7 (D.N.J. Dec. 1, 2009).

claims.  If the Court opens the door for extra-record material and permits discovery, Plaintiffs should also be allowed to enter.[11]

### III.   THE COURT SHOULD NOT PERMIT CRRM TO DELAY ADDRESSING THE MERITS OF THE DISPUTE.

CRRM requests that the Court delay briefing on the merits underlying Plaintiffs' stipulated penalty assessment for an unspecified period of time.  *See* Petition at 6.  CRRM rationalizes this delay by contending threshold issues should first be decided and discovery is necessary.  With respect to the threshold issues, CRRM only superficially lists each threshold issue and does not explain how early resolution of such issues would spare the Court from delving into the merits underlying CRRM's CD violations.  *See* Petition at 2–6.  In any event, once CRRM replies to this response, such issues will be fully briefed.

Moreover, CRRM exaggerates the effect resolution of the threshold issues could have on the Court's review of the merits.  CRRM's first threshold issue — regarding whether Plaintiffs can seek both stipulated and statutory penalties for Subpart Ja claims — does not obviate Court review of the Subpart J claims, which account for 75% of the penalties.  *See* Petition at 3.  CRRM's second threshold argument — based on subsumation — only applies to claims where subsumation occurred.  Plaintiffs applied complete subsumation only to ten of the eighteen stipulated penalty claims; it does not apply to the Subpart J claims or the numerous Subpart Ja flow monitoring claims.  *See* Supplemental Demand; SOP Attachment 38.  So even if CRRM is correct, the Court will still have to reach the merits of these non-subsumed claims.

---

[11] Even if the Court allows discovery, CRRM should not be permitted to serve unlimited document requests, forcing the governments to search through millions of documents, or seek countless depositions of governmental officials. Rather, any discovery should consist only of a limited number of interrogatories narrowly aimed to discover material CRRM has a reasonable basis to believe exists.

Page 29.

The third and fourth issues that CRRM characterize as "threshold" concern how penalties are to be calculated.  *See* Petition at 3.  As to these issues, CRRM advocates a backwards approach in which the Court decides how to calculate penalties before deciding liability.  The other way around is more typical and efficient because if CRRM succeeds in proving there were no violations, the Court would never reach the stipulated penalty calculation issues.

Finally, in contending that early resolution of threshold issues would avoid Court review of the merits, CRRM presumes that if stipulated penalties have been erroneously calculated, the remedy would be a remand for proper calculation.  Petition at 5.  However, this is not the case and nothing in the CD requires such a remand (indeed CRRM cites to no CD provision for this statement).  The Court can itself correct a calculation error and adjust the amount of the stipulated penalties that can be assessed.  The CD contemplates this very possibility.  *See* CD ¶ 203 (referring to the amount of penalty "determined to be due by the Court").

The Parties have spent two and a half years discussing the CD violations and nearly a year discussing the merits of Plaintiffs' stipulated penalty claims.  CRRM's Petition is emblematic of its strategy to delay necessary undertakings – in this case articulating the grounds of its dispute – for as long as possible.  CRRM had sixty days to respond to Plaintiffs' SOP and there is no need for it to have more time to do so.  Accordingly, the Court order CRRM to file a brief on the merits of its dispute within fifteen days of ruling on CRRM's request for discovery.

## **CONCLUSION**

For the reasons set forth above, the Court should reject the proposals in CRRM's Petition for Review.

Page 30.

Respectfully Submitted,

JEAN WILLIAMS
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources
Division

/s/ Elizabeth L. Loeb
ELIZABETH L. LOEB
NY Bar Number 2294809
Senior Attorney
JOANNA CITRON DAY
DC Bar Number 477833
Senior Counsel
HELEN LI
CT Bar Number 439117
Trial Attorney
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044-7611
Phone:  (202) 616-8916
Fax:  (202) 616-6584
elizabeth.loeb@usdoj.gov
joanna.day@usdoj.gov
helen.li2@usdoj.gov

*Attorneys for the United States*

DUSTON SLINKARD
Acting United States Attorney
District of Kansas

CHRISTOPHER ALLMAN
Assistant United States Attorney
Ks. S.Ct. No. 14225
500 State Avenue, Suite 360
Kansas City, Kansas 66101
PH: (913) 551-6730
FX: (913) 551-6541
Email: chris.allman@usdoj.gov

OF COUNSEL:

Britt Bieri
Shane McCoin
Assistant Regional Counsel
United States Environmental Protection Agency
Region 7
Lenexa, Kansas 66219

Sabrina Argentieri
Jennifer Lee
Attorney Advisors
Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C. 20004

For the State of Kansas and the Kansas Department of Health and Environment

/s/ Kate J. Gleeson

Kate J. Gleeson, No. 25518
Senior Environmental Attorney
Special Assistant Attorney General
Kansas Department of Health and Environment
1000 S.W. Jackson, Suite 560
Topeka, Kansas 66612
(785) 296-1607
(785) 559-4272 (fax)
kate.gleeson@ks.gov

CERTIFICATE OF SERVICE

      I hereby certify that on this 17th day of May, 2021, I electronically filed Plaintiffs' Response to Defendant's Petition for Review with the clerk of the Court through the CM/ECF system, which will send a notice of electronic filing to counsel of record for Defendant.

/s/ Elizabeth L. Loeb
ELIZABETH L. LOEB
NY Bar Number 2294809
Senior Attorney
